Filed 12/1/16

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| CECELIA KESNER, | ) | |
| | ) | S219534 |
| Petitioner, | ) | |
| | ) | Ct.App. 1/3 A136378 |
| v. | ) | |
| | ) | Alameda County |
| THE SUPERIOR COURT OF | ) | Super. Ct. No. RG11578906 |
| ALAMEDA COUNTY, | ) | |
| | ) | |
| Respondent; | ) | |
| | ) | |
| PNEUMO ABEX, LLC, | ) | |
| | ) | |
| Real Party in Interest. | ) | |
| _____ | ) | |
| CECELIA KESNER, | ) | |
| | ) | |
| Plaintiff and Appellant, | ) | |
| | ) | Ct.App. 1/3 A136416 |
| v. | ) | |
| | ) | Alameda County |
| PNEUMO ABEX, LLC, | ) | Super. Ct. No. RG11578906 |
| | ) | |
| Defendant and Respondent; | ) | |
| _____ | ) | |
| JOSHUA HAVER, et al. | ) | |
| | ) | S219919 |
| Plaintiffs and Appellants, | ) | |
| | ) | Ct.App. 2/5 B246527 |
| v. | ) | |
| | ) | Los Angeles County |
| BNSF RAILWAY COMPANY, | ) | Super. Ct. No. BC435551 |
| | ) | |
| Defendant and Respondent. | ) | |
| _____ | ) | |

1

These two cases ask whether employers or landowners owe a duty of care to prevent secondary exposure to asbestos. Such exposure, sometimes called domestic or take-home exposure, occurs when a worker who is directly exposed to a toxin carries it home on his or her person or clothing, and a household member is in turn exposed through physical proximity or contact with that worker or the worker's clothing. Plaintiffs in these actions for personal injury and wrongful death allege that take-home exposure to asbestos was a contributing cause to the deaths of Lynne Haver and Johnny Kesner, and that the employers of Lynne's former husband and Johnny's uncle had a duty to prevent this exposure. Defendants argue that users of asbestos have no duty, either as employers or as premises owners, to prevent nonemployees who have never visited their facilities from being exposed to asbestos used in defendants' business enterprises.

After the trial and appellate courts in these two cases reached varying conclusions as to the existence of this duty, we granted review and consolidated both cases for oral argument and decision to address the following questions: Does an employer that uses asbestos in the workplace have a duty of care to protect employees' household members from exposure to asbestos through off-site contact with employees who carry asbestos fibers on their work clothing, tools, vehicles, or persons? How, if at all, does this duty differ when the plaintiff states a claim for premises liability rather than general negligence? If an employer or premises owner has such a duty, is that duty limited to immediate family members or to members of the employee's household? Or does the duty extend to visitors, guests, or other persons with whom the employee may come into contact?

We hold that the duty of employers and premises owners to exercise ordinary care in their use of asbestos includes preventing exposure to asbestos

2

carried by the bodies and clothing of on-site workers. Where it is reasonably foreseeable that workers, their clothing, or personal effects will act as vectors carrying asbestos from the premises to household members, employers have a duty to take reasonable care to prevent this means of transmission. This duty also applies to premises owners who use asbestos on their property, subject to any exceptions and affirmative defenses generally applicable to premises owners, such as the rules of contractor liability. Importantly, we hold that this duty extends only to members of a worker's household. Because the duty is premised on the foreseeability of both the regularity and intensity of contact that occurs in a worker's home, it does not extend beyond this circumscribed category of potential plaintiffs.

## I.

Johnny Blaine Kesner, Jr., was diagnosed with perotineal mesothelioma in February 2011. (Because this case involves family members with the same last name, we use individuals' first names for clarity.) Johnny filed suit against a number of defendants he believed were responsible for exposing him to asbestos and causing his mesothelioma. These defendants included Pneumo Abex, LLC (Abex). Johnny's uncle, George Kesner, worked at the Abex plant in Winchester, Virginia, for much of George's life, where George was exposed to asbestos fibers released in the manufacture of brake shoes. According to George, Johnny spent an average of three nights per week at his uncle's home from 1973 to 1979. When Johnny was at his uncle's home, he would sometimes sleep near George or roughhouse with George while George was wearing his work clothes. Johnny alleged that his exposure to asbestos dust from the Abex plant, carried home on his uncle's clothes, contributed to his contracting mesothelioma. Johnny died in December 2014, after the Court of Appeal issued its judgment in this matter. Cecelia Kesner is his successor in interest.

3

Lynne Haver was diagnosed with mesothelioma in March 2008 and died in April 2009. Her children, Joshua Haver, Christopher Haver, Kyle Haver, and Jennifer Morris (the Havers), filed a wrongful death and survival action alleging negligence, premises owner and contractor liability, and loss of consortium. They allege that Lynne's exposure to asbestos by way of her former husband, Mike Haver, caused her cancer and death. Mike was employed by the Atchison, Topeka, and Santa Fe Railway, a predecessor of BNSF Railway Company (BNSF), from July 1972 through 1974. In his position as fireman and hostler for BNSF, Mike was exposed to asbestos from pipe insulation and other products. The Havers allege that Mike carried home these asbestos fibers on his body and clothing, and that Lynne was exposed through contact with him and his clothing, tools, and vehicle after she began living with him in 1973.

Mesothelioma is a cancer of the chest and abdomen closely associated with asbestos exposure. Asbestos can cause disease when an individual inhales or ingests microscopic asbestos fibers that have been released into the air. Some forms of asbestos, termed friable, release such fibers upon slight contact; nonfriable asbestos may release fibers if cut, sawed, or broken. (29 C.F.R. § 1926.1101, appen. H (2016).) The Havers and Kesner allege that BNSF and Abex, through the use or manufacture of asbestos-containing products, created a risk of harm to the household members of their employees by failing to exercise reasonable care in their use of asbestos-containing materials.

Neither the Havers' nor Kesner's suit reached a jury. Abex moved for nonsuit at the beginning of trial in light of *Campbell v. Ford Motor Co.* (2012) 206 Cal.App.4th 15, 34 (*Campbell*), which held that "a property owner has no duty to protect family members of workers on its premises from secondary exposure to asbestos used during the course of the property owner's business." The trial court granted this motion and entered a final judgment in Abex's favor on the ground

4

that Abex did not owe a duty to Kesner to prevent his exposure to asbestos. Kesner both appealed and petitioned the Court of Appeal for a writ of mandate. The Court of Appeal consolidated the appeal and writ proceeding, and reversed the trial court's grant of a nonsuit.

After the Havers filed suit, BNSF demurred to the complaint, also relying on *Campbell*. The trial court sustained the demurrer; the Havers appealed. The Court of Appeal held that *Campbell* correctly rejected the claim that premises owners owe a duty of care to household members who suffer take-home exposure to asbestos, and distinguished the Court of Appeal's decision in *Kesner* on the ground that Kesner's claim alleged negligence in the manufacture of brake pads, whereas the Havers' claim rested on a theory of premises liability.

We granted review in both cases and consolidated them for argument and decision in order to determine whether an employer has a duty to members of an employee's household to prevent take-home asbestos exposure on a premises liability or negligence theory.

## II.

A plaintiff in any negligence suit must demonstrate " 'a legal duty to use due care, a breach of such legal duty, and [that] the breach [is] the proximate or legal cause of the resulting injury.' " (*Beacon Residential Community Assn. v. Skidmore, Owings & Merrill LLP* (2014) 59 Cal.4th 568, 573 (*Beacon*), quoting *United States Liab. Ins. Co. v. Haidinger-Hayes, Inc.* (1970) 1 Cal.3d 586, 594.) Here we are tasked solely with deciding whether Abex or BNSF had a legal duty to prevent the injuries alleged by Kesner and the Havers.

"Duty is a question of law for the court, to be reviewed de novo on appeal." (*Cabral v. Ralphs Grocery Co.* (2011) 51 Cal.4th 764, 770 (*Cabral*).) "California law establishes the general duty of each person to exercise, in his or her activities, reasonable care for the safety of others. (Civ. Code, § 1714, subd. (a).)" (*Id.* at

5

p. 768.)  Civil Code section 1714, subdivision (a) provides in relevant part: "Everyone is responsible, not only for the result of his or her willful acts, but also for an injury occasioned to another by his or her want of ordinary care or skill in the management of his or her property or person, except so far as the latter has, willfully or by want of ordinary care, brought the injury upon himself or herself." (All subsequent statutory references are to the Civil Code unless otherwise indicated.)  " 'Courts . . . invoke[] the concept of duty to limit generally "the otherwise potentially infinite liability which would follow from every negligent act . . . ." ' " (*Bily v. Arthur Young & Co.* (1992) 3 Cal.4th 370, 397 (*Bily*), quoting *Thompson v. County of Alameda* (1980) 27 Cal.3d 741, 750.)  The conclusion that a defendant did not have a duty constitutes a determination by the court that public policy concerns outweigh, for a particular category of cases, the broad principle enacted by the Legislature that one's failure to exercise ordinary care incurs liability for all the harms that result.  "The history of the concept of duty in itself discloses that it is not an old and deep-rooted doctrine but a legal device of the latter half of the nineteenth century designed to curtail the feared propensities of juries toward liberal awards." (*Dillon v. Legg* (1968) 68 Cal.2d 728, 734.)  As a result, "in the absence of a statutory provision establishing an exception to the general rule of Civil Code section 1714, courts should create one only where " 'clearly supported by public policy.' " (*Cabral*, *supra*, 51 Cal.4th at p. 771, quoting *Rowland v. Christian* (1968) 69 Cal.2d 108, 112 (*Rowland*).)

In determining whether policy considerations weigh in favor of such an exception, we have said the most important factors are "the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and

6

consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved." (*Rowland*, *supra*, 69 Cal.2d at p. 113.) Because Civil Code section 1714 establishes a general duty to exercise ordinary care in one's activities, which includes the use of asbestos in one's business or on one's premises, we rely on these factors not to determine "whether a *new duty* should be created, but whether an *exception* to Civil Code section 1714 . . . should be created." (*Cabral*, *supra*, 51 Cal.4th at p. 783.)

Because a judicial decision on the issue of duty entails line-drawing based on policy considerations, "the *Rowland* factors are evaluated at a relatively broad level of factual generality. . . . [¶] In applying the . . . *Rowland* factors, . . . we have asked not whether they support an exception to the general duty of reasonable care on the facts of the particular case before us, but whether carving out an entire category of cases from that general duty rule is justified by clear considerations of policy. . . . [¶] By making exceptions to Civil Code section 1714's general duty of ordinary care only when foreseeability and policy considerations justify a categorical no-duty rule, we preserve the crucial distinction between a determination that the defendant owed the plaintiff no duty of ordinary care, which is for the *court* to make, and a determination that the defendant did not breach the duty of ordinary care, which in a jury trial is for the *jury* to make." (*Cabral*, *supra*, 51 Cal.4th at p. 772; see Rest.3d Torts, Liability for Physical and Emotional Harm, § 7, com. *a,* p. 78 ["No-duty rules are appropriate only when a court can promulgate relatively clear, categorical, bright-line rules of law applicable to a general class of cases."].)

In this respect, duty differs from the other elements of a tort. Breach, injury, and causation must be demonstrated on the basis of facts adduced at trial, and a jury's determination of each must take into account the particular context in

7

which any act or injury occurred. Analysis of duty occurs at a higher level of generality. In *Cabral*, we held it was irrelevant to the question of duty whether the defendant had "parked 16 feet from the outermost traffic lane, rather than six feet or 26 feet; that parking for emergencies was permitted in the dirt area he chose; that [plaintiff] likely left the highway because he fell asleep or because of some unknown adverse health event, rather than from distraction or even intoxication." (*Cabral*, *supra*, 51 Cal.4th at p. 774.) Each of these factual circumstances went to elements other than duty, such as breach or proximate causation.

Here, because "the general duty to take ordinary care in the conduct of one's activities" applies to the use of asbestos on an owner's premises or in an employer's manufacturing processes, "the issue is also properly stated as whether a categorical exception to that general rule should be made" exempting property owners and employers from potential liability to individuals who were exposed to asbestos by way of employees carrying it on their clothes or person. (*Cabral*, *supra*, 51 Cal.4th at p. 774, citing § 1714, subd. (a).) In answering this question, our task is not to decide whether Kesner or the Havers have proven that asbestos from Abex or BNSF actually and foreseeably reached Johnny Kesner or Lynne Haver, or whether Abex's or BNSF's asbestos contributed to the disease that Johnny or Lynne suffered, or whether Abex or BNSF had adequate procedures in place to prevent take-home exposure. Our task is to determine whether household exposure is *categorically* unforeseeable and, if not, whether allowing the possibility of liability would result in such significant social burdens that the law should not recognize such claims. As noted, we will not "carv[e] out an entire category of cases from th[e] general duty rule" of section 1714, subdivision (a), unless doing so "is justified by clear considerations of policy." (*Cabral*, at p. 772.)

8

## III.

The *Rowland* factors fall into two categories. Three factors — foreseeability, certainty, and the connection between plaintiff and defendant — address the foreseeability of the relevant injury, while the other four — moral blame, preventing future harm, burden, and availability of insurance — take into account public policy concerns that might support excluding certain kinds of plaintiffs or injuries from relief. As explained below, we conclude that the exposure of household members to take-home asbestos is generally foreseeable and that BNSF and Abex have not shown that categorically barring take-home claims is justified by clear considerations of policy. Accordingly, Abex and BNSF owed plaintiffs a duty of ordinary care to prevent take-home exposure.

### A.

The most important factor to consider in determining whether to create an exception to the general duty to exercise ordinary care articulated by section 1714 is whether the injury in question was foreseeable. (*Tarasoff v. Regents of Univ. of California* (1976) 17 Cal.3d 425, 434 (*Tarasoff*).) With respect to this factor, we conclude that it was foreseeable that people who work with or around asbestos may carry asbestos fibers home with them and expose members of their household. This factor weighs in favor of the existence of a duty.

"[A]s to foreseeability, . . . the court's task in determining duty 'is not to decide whether a *particular* plaintiff's injury was reasonably foreseeable in light of a *particular* defendant's conduct, but rather to evaluate more generally whether the category of negligent conduct at issue is sufficiently likely to result in the kind of harm experienced that liability may appropriately be imposed . . . .' " (*Cabral*, *supra*, 51 Cal.4th at p. 772; accord, *Parsons v. Crown Disposal Co.* (1997) 15 Cal.4th 456, 476 (*Parsons*); *Jackson v. Ryder Truck Rental, Inc.* (1993) 16 Cal.App.4th 1830, 1839.) For purposes of duty analysis, " 'foreseeability is not to

9

be measured by what is more probable than not, but includes whatever is likely enough in the setting of modern life that a reasonably thoughtful [person] would take account of it in guiding practical conduct.'. . . [I]t is settled that what is required to be foreseeable is the general character of the event or harm — e.g., being struck by a car while standing in a phone booth — not its precise nature or manner of occurrence." (*Bigbee v. Pac. Tel. & Tel. Co.* (1983) 34 Cal.3d 49, 57–58 (*Bigbee*).)

A reasonably thoughtful person making industrial use of asbestos during the time periods at issue in this case (i.e., the mid-1970s) would take into account the possibility that asbestos fibers could become attached to an employee's clothing or person, travel to that employee's home, and thereby reach other persons who lived in the home. (See *Olivo v. Owens-Illinois, Inc.* (N.J. 2006) 895 A.2d 1143, 1149 (*Olivo*) ["It requires no leap of imagination to presume that . . . [the worker's] spouse would be handling [the worker's] clothes in the normal and expected process of laundering them so that the garments could be worn to work again."].) It is a matter of common experience and knowledge that dust or other substances may be carried from place to place on one's clothing or person, as anyone who has cleaned an attic or spent time in a smoky room can attest. Defendants would not need to know "the precise . . . manner" that exposure occurred (i.e., that Lynne laundered Mike's clothing or that George roughhoused with his nephew Johnny) in order to recognize the general risk posed by workers leaving an area with airborne dust-based toxins and then coming into contact with members of their households. (*Bigbee*, *supra*, 34 Cal.3d at p. 58.)

Moreover, at the time George Kesner and Mike Haver worked for defendants, broadly applicable regulations identified the potential health risks of asbestos traveling outside a worksite. In June 1972, the federal Occupational Safety and Health Administration (OSHA) published its first permanent

10

regulations for employers using asbestos. (OSHA, Standard for Exposure to Asbestos Dust, 37 Fed. Reg. 11320 (June 7, 1972) (OSHA Standard), amending 29 C.F.R. § 1910 et seq.; for current regulation, see 29 CFR § 1910.0001 et seq. (2016); see also *Industrial Union Department, AFL-CIO v. Hodgson* (D.C.Cir. 1974) 499 F.2d 467, 471–472 (*Industrial Union*).) In addition to setting a ceiling for employee exposure to airborne asbestos, the OSHA Standard required employers to take precautions for employees and others who may be exposed to concentrations of airborne asbestos above that ceiling. (OSHA Standard, *supra*, 37 Fed. Reg. 11320, adding 29 C.F.R. former § 1910.93a.) Some precautions contemplated asbestos traveling within a worksite. For example, the regulations required employers to post signs in all areas of high airborne asbestos concentrations "at such a distance from such a location so that an employee may read the signs and take necessary protective steps before entering the area marked by the signs." (*Id.*, 37 Fed. Reg. 11321.) Others protected nonemployees from asbestos traveling outside of a worksite on employees' clothing. Under the regulations, employers were required to provide their asbestos-exposed employees with special clothing and changing rooms. (*Ibid.*) Employers were required to inform launderers of asbestos-exposed clothing of the asbestos contamination and to transport asbestos-exposed clothing "in sealed impermeable bags, or other closed, impermeable containers" that were appropriately labeled as containing asbestos. (*Ibid.*) Moreover, employers were required to provide "two separate lockers or containers for each employee, so separated or isolated as to prevent contamination of the employee's street clothes from his work clothes." (*Ibid.*)

Well before OSHA issued the 1972 standard, the federal government and industrial hygienists recommended that employers take measures to prevent employees who worked with toxins from contaminating their families by changing and showering before leaving the workplace. In 1952, the United States

11

Department of Labor's standards for federal contractors provided that "[w]orkers who handle or are exposed to harmful materials in such a manner that contact of work clothes with street clothes will communicate to the latter the harmful substances . . . should be provided with facilities which will prevent this contact." (U.S. Dept. of Labor, Safety and Health Standards For Contractors performing Federal Supply Contracts under the Walsh-Healey Public Contracts Act (1952) pt. III. B. 5 (d), 25.) The International Labour Office's Standard Code of Industrial Hygiene (Geneva 1934) recommended washing accommodation and cloakrooms for workers "[i]n dusty trades." (*Id.*, art. 4, std. 40, at p. 15.) It was also known that take-home exposure to asbestos could cause serious injury; as early as 1965, scholarly journals documented fatal cases of mesothelioma where patients' only exposure was through living with an asbestos worker. (See Newhouse & Thompson, *Mesothelioma of Pleura and Peritoneum Following Exposure to Asbestos in the London Area* (1965) vol. 22, No. 4 Brit. J. Indus. Med. 261, 264.)

Defendants argue that there was no scientific consensus regarding the risks of take-home asbestos during the relevant time periods here. But defendants cite no authority requiring a scientific consensus to establish foreseeability in the context of duty analysis. (Cf. *Tarasoff*, *supra*, 17 Cal.3d at pp. 437–438 [rejecting the argument that because the state of scientific evidence did not enable therapists to accurately predict whether patients will act violently, therapists have no duty to third parties for their patients' violent conduct, and instead holding that therapists must "exercise 'that reasonable degree of skill, knowledge, and care ordinarily possessed and exercised by members of [that professional specialty] under similar circumstances' "].) The OSHA Standard — informed by a four-day public hearing "at which various representatives and experts appeared on behalf of interested parties," and by recommendations from the National Institute for Occupational Safety and Health and from an Advisory Committee on Asbestos

12

Standards composed of two employer and two labor representatives, plus a representative of the public (*Industrial Union*, *supra*, 499 F.2d at p. 470; see id. at p. 470, fn. 4) — observed that "[n]o one has disputed that exposure to asbestos of high enough intensity and long enough duration is causally related to asbestosis and cancers. The dispute is as to the determination of a specific level below which exposure is safe." (OSHA Standard, *supra*, 37 Fed. Reg. 11318.) After acknowledging conflicting evidence, the OSHA Standard said: "In view of the undisputed grave consequences from exposure to asbestos fibers, it is essential that the exposure be regulated now, on the basis of the best evidence available now, even though it may not be as good as scientifically desirable." (*Ibid.*) The risks of exposure that prompted OSHA to require precautions against take-home exposure were sufficient to provide notice of the reasonable foreseeability of such harm. Indeed, our research reveals no reported case in which an employer or industry group challenged the 1972 OSHA Standard for lack of substantial evidence.

The second *Rowland* factor, the degree of certainty that the plaintiff suffered injury, "has been noted primarily, if not exclusively, when the only claimed injury is an intangible harm such as emotional distress. " (*Bily*, *supra*, 3 Cal.4th at p. 421.) Courts have occasionally included under this factor concerns about the existence of a remedy. (See *Cabral*, *supra*, 51 Cal.4th at p. 781, fn. 9.) Cecelia Kesner and the Havers allege that Johnny Kesner and Lynne Haver died as a result of mesothelioma; their injuries are certain and compensable under the law.

The third *Rowland* factor, " 'the closeness of the connection between the defendant's conduct and the injury suffered[,]' [citation] is strongly related to the question of foreseeability itself." (*Cabral*, *supra*, 51 Cal.4th at p. 779.) BNSF argues that the connection between defendants' conduct and plaintiffs' illness is "indirect and attenuated" because it "relies on the intervening acts of a defendant's

13

employee to transmit the alleged asbestos risk to the plaintiff." The "closeness" factor, BNSF argues, "weighs strongly against the imposition of a legal duty."

"It is well established . . . that one's general duty to exercise due care includes the duty not to place another person in a situation in which the other person is exposed to an unreasonable risk of harm through the reasonably foreseeable conduct (including the reasonably foreseeable negligent conduct) of a third person." (*Lugtu v. California Highway Patrol* (2001) 26 Cal.4th 703, 716.) In determining whether one has a duty to prevent injury that is the result of third party conduct, the touchstone of the analysis is the foreseeability of that intervening conduct. (See *Bigbee*, *supra*, 34 Cal.3d at p. 58, quoting Rest.2d Torts, § 449.) The relevant intervening conduct here — that workers returned home at the end of the day and, without adequate precautions, would bring asbestos dust home — is entirely foreseeable. An intervening third party's actions that are "themselves derivative of defendants' allegedly negligent conduct . . . do not diminish the closeness of the connection between defendant's conduct and plaintiff's injury for purposes of determining the existence of a duty of care." (*Beacon*, *supra*, 59 Cal.4th at p. 583.) An employee's role as a vector in bringing asbestos fibers into his or her home is derived from the employer's or property owner's failure to control or limit exposure in the workplace.

In support of its claim that Lynne Haver's injury had only an attenuated connection to defendants' use of asbestos, BNSF cites cases involving car accidents in which the plaintiffs attempted to hold the defendants liable for creating the situation in which they were hit by a third party driver. But each of those cases turned on either the lack of foreseeability of the intervening negligent conduct or the lack of relationship between the intervening conduct and the defendant's negligence. (See *Hoff v. Vacaville Unified School District* (1998) 19 Cal.4th 925, 936 ["school personnel who neither know nor reasonably should

14

know that a particular student has a tendency to drive recklessly owe no duty to off-campus nonstudents"]; *Richards v. Stanley* (1954) 43 Cal.2d 60, 65 [where "the defendant has no reason to believe that the third person is incompetent to manage" property, the defendant has no duty to prevent negligent use of lent or stolen property]; *Bryant v. Glastetter* (1995) 32 Cal.App.4th 770, 782 ["there is no logical cause and effect relationship between that negligence and the harm suffered by decedent except for the fact that it placed decedent in a position to be acted upon by the negligent third party"].)  Where there *is* a logical causal connection between the defendant's negligent conduct and the intervening negligence of a third party driver, making the intervening negligence foreseeable, we have found both a duty and liability.  (See *Weirum v. RKO General, Inc.* (1975) 15 Cal.3d 40 [affirming a wrongful death judgment against a radio broadcaster where radio contest that awarded teen drivers for being the first to reach a disc jockey driving around the area induced reckless driving that killed decedent].)

In sum, BNSF's reliance on our cases involving third party drivers is unavailing.  The gravamen of plaintiffs' claims is that defendants failed to mitigate known risks associated with the use of asbestos.  Increased risk of mesothelioma is a characteristic harm that makes the use of asbestos-containing materials unreasonably dangerous in the absence of protective measures.  An employee's return home at the end of the workday is not an unusual occurrence, but rather a baseline assumption that can be made about employees' behavior.  The risk of take-home exposure to asbestos " 'is likely enough in the setting of modern life that a reasonably thoughtful [employer or property owner] would take account of it in guiding practical conduct' " in the workplace.  (*Bigbee*, *supra*, 34 Cal.3d at p. 57.)  Moreover, the intervening conduct leading to this exposure is predictable

15

and derivative of the alleged misconduct, namely, failure to control the movement of asbestos fibers.  The foreseeability factors weigh in favor of finding a duty here.

**B.**

"[F]oreseeability alone is not sufficient to create an independent tort duty. ' " . . . [The] existence [of a duty] depends upon the foreseeability of the risk and a weighing of policy considerations for and against imposition of liability." ' " (*Erlich v. Menezes* (1999) 21 Cal.4th 543, 552.)  These policy considerations include " 'the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved' (*Rowland*, *supra*, 69 Cal.2d at p. 113)." (*Cabral*, *supra*, 51 Cal.4th at p. 781.)  "A duty of care will not be held to exist even as to foreseeable injuries . . . where the social utility of the activity concerned is so great, and avoidance of the injuries so burdensome to society, as to outweigh the compensatory and cost-internalization values of negligence liability.  [Citations.]" (*Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 502.)  We first address prevention of future harm, moral blame, and availability of insurance, and then discuss the burden that a finding of duty here would impose on both defendants.

"The overall policy of preventing future harm is ordinarily served, in tort law, by imposing the costs of negligent conduct upon those responsible." (*Cabral*, *supra*, 51 Cal.4th at p. 781.)  In general, internalizing the cost of injuries caused by a particular behavior will induce changes in that behavior to make it safer.  That consideration may be "outweighed, for a category of negligent conduct, by laws or mores indicating approval of the conduct or by the undesirable consequences of allowing potential liability." (*Id.* at p. 782.)

16

Defendants contend that the future risk of the particular injury at issue — mesothelioma resulting from exposure to airborne asbestos fibers — has largely been eliminated through extensive regulation and reduced asbestos usage. In light of state and federal regulations that currently mandate extensive precautions (see, e.g., Lab. Code, §§ 9000–9052; 29 C.F.R. § 1910.1001 (2016) [federal regulations setting forth detailed protective measures and limits for occupational exposure to asbestos]; 40 C.F.R. § 763.165 (2015) [banning the import and manufacture of certain asbestos-containing products]), imposing a duty to prevent secondary exposure is unlikely to alter the behavior of current asbestos-using businesses. Defendants thus argue there is little prospective benefit to finding a duty here.

But whether or how the imposition of liability would affect the conduct of current asbestos users, our duty analysis looks to the time when the duty was assertedly owed. Just as we look to the availability of scientific studies to assess the foreseeability of injury due to take-home asbestos exposure at the time Lynne and Johnny were exposed, the relevant question for this factor is whether imposing tort liability in the 1970s would have prevented future harm from that point. The numerous regulations cited by BNSF suggest that legislatures and agencies readily adopted the premise that imposing liability would prevent future harm. And BNSF points to no countervailing state policy promoting the use of asbestos to outweigh our general presumption in favor of incentivizing reasonable preventative measures. (See *Cabral*, *supra*, 51 Cal.4th at p. 782.) Rather, as the regulations cited above make clear, there is a strong public policy limiting or forbidding the use of asbestos.

As for moral blame, this factor can be difficult to assess in the absence of a factual record. (See *Randi W. v. Muroc Joint Unified Sch. Dist.* (1997) 14 Cal.4th 1066, 1078.) We have previously assigned moral blame, and we have relied in part on that blame in finding a duty, in instances where the plaintiffs are

17

particularly powerless or unsophisticated compared to the defendants or where the defendants exercised greater control over the risks at issue. (See *Beacon*, *supra*, 59 Cal.4th at p. 586 ["Because of defendants' unique and well-compensated role in the Project as well as their awareness that future homeowners would rely on their specialized expertise in designing safe and habitable homes, significant moral blame attaches to defendants' conduct."]; *Peterson v. San Francisco Community College Dist.* (1984) 36 Cal.3d 799, 814 [failure to take intervening action to improve safety of facilities "if established, also indicate[s] that there is moral blame attached to the defendants' failure to take steps to avert the foreseeable harm"].) Similar considerations apply here, as commercial users of asbestos benefitted financially from their use of asbestos and had greater information and control over the hazard than employees' households. Negligence in their use of asbestos is morally blameworthy, and this factor weighs in favor of finding a duty.

As for the availability of insurance, Abex contends that insurance for asbestos-related injuries is no longer widely available, as the insurance industry has revised its standard commercial general liability policies to exclude asbestos. But the relevant insurance policies are those that were available to defendants at the time of exposure, even if the availability of such policies declined along with the dramatic drop in the use of asbestos.

Among those defendants that had purchased suitable coverage, BNSF and Abex contend, the scope of potential liability for take-home exposure would exceed policy limits. We do not speculate on, and defendants do not offer, the precise policy terms or estimates of the number of take-home claims to support such an empirical conclusion. At the level of generality appropriate to duty analysis, it is not obvious that secondary asbestos exposure poses greater uncertainty in terms of potential claimants and total liability than, say, the negligent release of chemicals into the air or negligent contamination of

18

groundwater. More to the point, BNSF argues that even if defendants could limit the size of judgments against them by defeating plaintiffs' claims of causation or injury, "the burdens of participating in discovery and defending a case up to and through a jury trial" would overwhelm insurers and defendants alike. Whatever the ultimate liability of defendants for take-home asbestos exposure, their concern is that the magnitude and uncertainty of *potential* liability make insuring against it impossible.

At its core, this argument regarding the availability and cost of insurance merges with the main policy consideration urged by Abex and BNSF: Allowing tort liability for take-home asbestos exposure would dramatically increase the volume of asbestos litigation, undermine its integrity, and create enormous costs for the courts and community. The already "elephantine mass of asbestos cases" would further expand. (*Ortiz v. Fibreboard Corp.* (1999) 527 U.S. 815, 821; see *Amchem Products, Inc. v. Windsor* (1997) 521 U.S. 591, 598.) Bringing such cases to trial would entail "inherently tricky fact-finding," Abex contends, against a backdrop of fading memories, reorganized and successor corporations, lost records, and evolving regulatory standards informing the particular duty in any given case. Moreover, defendants argue, recognizing a duty would permit sufferers of mesothelioma or asbestosis who may have also been exposed in their own workplaces to sue their family members' employers as well as their own. Such suits would target contributors to a plaintiff's total asbestos exposure on the basis of relative solvency instead of relative fault, with joint and several liability resulting in significant judgments against relatively small contributors.

In evaluating defendants' concerns, we begin by observing that the relevant burden in the analysis of duty is not the cost to the defendants of compensating individuals for past negligence. To the extent defendants argue that the costs of paying compensation for injuries that a jury finds they have actually caused would

19

be so great that we should find no duty to prevent those injuries, the answer is that shielding tortfeasors from the full magnitude of their liability for past wrongs is not a proper consideration in determining the existence of a duty. Rather, our duty analysis is forward-looking, and the most relevant burden is the cost to the defendants of upholding, not violating, the duty of ordinary care. (See, e.g., *Parsons*, *supra*, 15 Cal.4th at p. 473 [assessing the behavior changes that machinery operators and local landowners would have to make to prevent spooking horses with loud noises as the relevant "burden to the defendant and consequences to the community" under *Rowland*]; *Isaacs v. Huntington Memorial Hospital* (1985) 38 Cal.3d 112, 131 ["The foreseeability of an assault was high in comparison to the minimal burden on the hospital to take security measures . . . ."].) Neither the Court of Appeal in *Haver* nor defendants suggest that preventing Lynne's or Johnny's exposure to asbestos was unreasonably expensive to defendants or that the costs would have impeded defendants' ability to carry out an activity with significant social utility. In general, preventing injuries to workers' household members due to asbestos exposure does not impose a greater burden than preventing exposure and injury to the workers themselves. Defendants do not claim that precautions to prevent transmission via employees to off-site individuals — such as changing rooms, showers, separate lockers, and on-site laundry — would unreasonably interfere with business operations.

Defendants further argue that a finding of duty here will result in increased insurance costs and tort damages, and ultimately impose a burden on consumers and the community. But the tort system contemplates that the cost of an injury, instead of amounting to a "needless" and "overwhelming misfortune to the person injured," will instead "be insured by the [defendant] and distributed among the public as a cost of doing business." (*Escola v. Coca Cola Bottling Co.* (1944) 24 Cal.2d 453, 462 (conc. opn. of Traynor, J.).) Such allocation of costs serves to

20

ensure that those "best situated" to prevent such injuries are incentivized to do so. (*Ibid.*; see generally Calabresi, The Cost of Accidents: A Legal and Economic Analysis (1970).) Employers and premises owners are generally better positioned than their employees or members of their employees' households to know of the dangers of asbestos and its transmission pathways, and to take reasonable precautions to avoid injuries that may result from on-site and take-home exposure. BNSF observes that because the market for asbestos products has contracted significantly in the decades between Johnny's and Lynne's exposure and the current suits, the costs of these suits will be borne by entities other than the companies that directly benefitted from the past use of asbestos. But this is a concern that applies to *all* asbestos injuries. It does not provide a basis for discriminating between those plaintiffs who experienced on-site exposure to asbestos and those plaintiffs who experienced take-home exposures.

Defendants' most forceful contention is that a finding of duty in these cases would open the door to an "enormous pool of potential plaintiffs." BNSF argues there is no logical way of distinguishing between Lynne and anyone else who may have been exposed to asbestos carried by their on-site employees. Once we accept the principle of liability for asbestos exposure by means of employees carrying fibers outside the workplace, they argue, we invite claims from anyone who may have had contact with an asbestos worker, including "innumerable relatives, friends, acquaintances, [and] service providers," as well as "babysitters, neighbors, . . . carpool partners, fellow commuters on public transportation, and laundry workers." According to defendants, such an unlimited duty imposes great costs and uncertainty, and invites voluminous and frequently meritless claims that will overwhelm the courts.

21

Like the Court of Appeal in *Haver*, defendants rely on *Campbell*, *supra*, 206 Cal.App.4th 15, to argue that the uncertainty and size of potential liability for defendants weighed against a finding of duty. *Campbell*, in turn, relied on *Oddone v. Superior Court* (2009) 179 Cal.App.4th 813. In *Oddone*, the plaintiff alleged that her husband's employer negligently exposed him to toxic chemicals, which the husband then brought home to the plaintiff, injuring her. (*Id*. at p. 816.) *Oddone* said: "The gist of the matter is that imposing a duty toward nonemployee persons saddles the defendant employer with a burden of uncertain but potentially very large scope. One of the consequences to the community of such an extension is the cost of insuring against liability of unknown but potentially massive dimension. Ultimately, such costs are borne by the consumer. In short, the burden on the defendant is substantial and the costs to the community may be considerable." (*Id.* at p. 822; accord, *Campbell*, at p. 33.)

Defendants are correct that a finding of " ' "[n]o duty" ' " is in effect " 'a global determination that, for some overriding policy reason, courts should not entertain causes of action for cases that fall into certain categories,' " even if some defendants in such cases did actually cause the harm of which the plaintiffs complained. (*Castaneda v. Olsher* (2007) 41 Cal.4th 1205, 1228 (conc. opn. of Kennard, J.), quoting Sugarman, *Assumption of Risk* (1997) 31 Valparaiso U. L.Rev. 833, 843.) " '[N]ot every loss can be made compensable in money damages, and legal causation must terminate somewhere." (*Borer v. American Airlines, Inc.* (1977) 19 Cal.3d 441, 446.) Even if recognizing a duty would enable some plaintiffs to obtain legitimate compensation for their injuries, the argument goes, this interest is outweighed by the costs — to the defendants, the judicial system, and society as a whole — of unremitting litigation by other plaintiffs whose claims are tenuous at best.

But recognizing a duty with respect to one set of potential plaintiffs does not imply that *any* plaintiff may make a similar claim. "If the actor's conduct creates such a recognizable risk of harm only to a particular class of persons, the fact that it in fact causes harm to a person of a different class, to whom the actor could not reasonably have anticipated injury, does not make the actor liable to the persons so injured." (Rest.2d Torts § 281, com. (c), p. 5.) Although defendants raise legitimate concerns regarding the unmanageability of claims premised upon incidental exposure, as in a restaurant or city bus, these concerns do not clearly justify a categorical rule against liability for foreseeable take-home exposure. (*Cabral*, *supra*, 51 Cal.4th at p. 772.) Instead, the concerns point to the need for a limitation on the scope of the duty here.

We hold that an employer's or property owner's duty to prevent take-home exposure extends only to members of a worker's household, i.e., persons who live with the worker and are thus foreseeably in close and sustained contact with the worker over a significant period of time. To be sure, there are other persons who may have reason to believe they were exposed to significant quantities of asbestos by repeatedly spending time in an enclosed space with an asbestos worker — for example, a regular carpool companion. But any duty rule will necessarily exclude some individuals who, as a causal matter, were harmed by the conduct of potential defendants. By drawing the line at members of a household, we limit potential plaintiffs to an identifiable category of persons who, as a class, are most likely to have suffered a legitimate, compensable harm.

This limitation comports with our duty analysis under *Rowland*. Our finding of foreseeability turned on the fact that a worker can be expected to return home each work day and to have close contact with household members on a regular basis over many years. Persons whose contact with the worker is more incidental, sporadic, or transitory do not, as a class, share the same characteristics

as household members and are therefore not within the scope of the duty we identify here. This rule strikes a workable balance between ensuring that reasonably foreseeable injuries are compensated and protecting courts and defendants from the costs associated with litigation of disproportionately meritless claims.

Abex contends that if we find a duty to prevent take-home exposure, the duty should be limited to immediate family members. But extending the duty to household members, not just immediate family members, more closely tracks the rationale for the existence of the duty. "Being a household member refers not only to the relationships among members of a family, but also to the bonds which may be found among unrelated persons adopting nontraditional and quasi-familial living arrangements." (*People v. Jeffers* (1987) 43 Cal.3d 984, 992.) As used in other legal contexts, the term "household" refers to persons who share " 'physical presence under a common roof' " (*People v. Wutzke* (2002) 28 Cal.4th 923, 939) or relationships aimed at common subsistence (*Safeco Ins. Co. of America v. Parks* (2004) 122 Cal.App.4th 779, 792). The cause of asbestos-related diseases is the inhalation of asbestos fibers; the general foreseeability of harm turns on the regularity and intimacy of physical proximity, not the legal or biological relationship, between the asbestos worker and a potential plaintiff.

As an instructive point of contrast, we have limited the scope of a duty to immediate family members where the alleged injury is negligent infliction of emotional distress (*Thing v. La Chusa* (1989) 48 Cal.3d 644; *Christensen v. Superior Court* (1991) 54 Cal.3d 868) or loss of consortium (*Elden v. Sheldon* (1988) 46 Cal.3d 267; *Borer v. American Airlines, Inc.*, *supra*, 19 Cal.3d 441; *Baxter v. Superior Court* (1977) 19 Cal.3d 461). In each of these cases, the emotional injury grew out of the loss of a relationship to a third party or the vicarious suffering of the plaintiff with respect to that third party. Here, the

24

significance of a plaintiff's relationship to a third party (an asbestos worker) lies in the degree of exposure the plaintiff had to asbestos dust as a result of his or her physical contact and cohabitation with the third party in an enclosed space. Such contact and cohabitation within a household does not depend on a legal or biological relationship between the plaintiff and the worker.

## C.

In sum, proper application of the *Rowland* factors supports the conclusion that defendants had a duty of ordinary care to prevent take-home asbestos exposure. Such exposure and its resulting harms to human health were reasonably foreseeable to large-scale users of asbestos by the 1970s, and the OSHA Standard affirmed the commonsense reality that asbestos fibers could be carried on the person or clothing of employees to their homes and could be inhaled there by household members. Businesses making use of asbestos were well positioned, relative to their workers, to undertake preventive measures, and Abex and BNSF cite no evidence to suggest such measures would have been unreasonably costly. Although the lawful use of asbestos is not inherently reprehensible, no state policy promotes or specially protects it. We are mindful that recognizing a duty to all persons who experienced secondary exposure could invite a mass of litigation that imposes uncertain and potentially massive and uninsurable burdens on defendants, the courts, and society. But this concern does not clearly justify a categorical exemption from liability for take-home exposure. "The law is not indifferent to considerations of degree" (*A.L.A. Schechter Poultry Corp. v. U.S.* (1935) 295 U.S. 495, 554 (conc. opn. of Cardozo, J.)), and the foreseeability of take-home exposure and associated risk of injury are at their maximum when it comes to members of an employee's household. Accordingly, we hold that defendants owed the members of their employees' households a duty of ordinary care to prevent take-home exposure and that this duty extends no further. We disapprove

25

*Campbell v. Ford Motor Co.*, *supra*, 206 Cal.App.4th 15, and *Oddone v. Superior Court*, *supra*, 179 Cal.App.4th 813, to the extent they are inconsistent with this opinion.

Defendants analogize the present cases to *Bily*, *supra*, 3 Cal.4th 370, but the comparison actually reinforces why relevant policy considerations weigh in favor of a duty here. The court in *Bily* was concerned that "[a]n award of damages for pure economic loss suffered by third parties raises the spectre of vast numbers of suits and limitless financial exposure" for auditors, a concern similar to those raised by defendants here. (*Id.* at p. 400.) We held that accountants do not have a duty to prevent investors' losses as a result of negligent auditing because (1) "the complexity of the professional opinions rendered in audit reports, and the difficult and potentially tenuous causal relationships between audit reports and economic losses from investment and credit decisions" make it challenging to determine the causal relationship between auditor mistakes and investor losses; (2) "the generally more sophisticated class of plaintiffs" makes contract rather than tort law an effective means of allocating risk; and (3) the added risk of secondary liability is unlikely to alter accountants' behavior because they already have a significant business interest in accuracy. (*Id.* at p. 398.)

None of these countervailing considerations applies to take-home asbestos exposure: (1) Unlike the causal relationship between auditor mistakes and investor losses, the causal relationship between preventable asbestos exposure of sufficient intensity and duration and the type of injuries plaintiffs allege here is clear and scientifically well established, and was so at the time of Lynne's and Johnny's alleged exposure. (See OSHA Standard, *supra*, 37 Fed. Reg. 11318 ["No one has disputed that exposure to asbestos of high enough intensity and long enough duration is causally related to asbestosis and cancers."].) (2) Plaintiffs such as Lynne and Johnny are not sophisticated with respect to the dangers of

26

asbestos, much less able to contract with the relevant employers or premises owners regarding safety procedures. (3) Nor do asbestos-using companies have a business interest, apart from potential liability, in taking precautions to prevent take-home exposure. Moreover, we have limited the duty to prevent take-home asbestos exposure to a discrete category, namely, members of a worker's household. This limitation means that not all persons who foreseeably experienced secondary exposure may sue for damages; as a result, defendants are unlikely to "face[] potential liability far out of proportion to [their] fault." (*Bily*, *supra*, 3 Cal.4th at p. 398.)

Finally, Abex argues that even if we find it had a duty to prevent take-home asbestos exposure, we must find as a matter of law that Kesner cannot meet the burden of demonstrating proximate causation. Whatever merit this argument may have, we do not address it here. The only issue on which we granted review was whether a duty exists to prevent take-home exposure. We have no occasion to address other arguments defendants might make to defeat liability. It must be remembered that a finding of duty is not a finding of liability. To obtain a judgment, a plaintiff must prove that the defendant breached its duty of ordinary care and that the breach proximately caused the plaintiff's injury, and the defendant may assert defenses and submit contrary evidence on each of these elements. Here, Abex may argue that in light of other sources of asbestos to which Johnny may have been exposed, one cannot say with sufficient certainty that fibers carried home by his uncle were a "substantial factor" (*Rutherford v. Owens-Illinois, Inc.* (1997) 16 Cal.4th 953, 968) in bringing about Johnny's mesothelioma. BNSF similarly argues (with respect to the "closeness of connection" between its conduct and Lynne's injuries) that the Havers' own complaint, by alleging that Mike was exposed to asbestos in a variety of other contexts, casts doubt on the causal relationship between BNSF's use of asbestos

27

and Lynne's mesothelioma. The possibility of other sources of exposure is a fact-specific inquiry; it does not bear on the question of duty, which must be addressed at a higher level of generality. (*Cabral*, *supra*, 51 Cal.4th at p. 772.)

**IV.**

The Havers and Kesner allege different primary theories of liability: premises liability (the Havers) and negligence (Kesner). BNSF argues that even if employers have a duty to prevent employees from exposing members of their household to asbestos by carrying fibers home on their clothing, property owners do not have a similar obligation with respect to workers on their premises. According to BNSF, to hold that property owners owe a duty of ordinary care to persons who have never set foot on the premises "would take the 'premises' out of premises liability and unsettle the tort law that applies to all property owners in this state." We disagree.

The elements of a negligence claim and a premises liability claim are the same: a legal duty of care, breach of that duty, and proximate cause resulting in injury. (*Castellon v. U.S. Bancorp* (2013) 220 Cal.App.4th 994, 998; see *Ladd v. County of San Mateo* (1996) 12 Cal.4th 913, 917 [negligence cause of action]; *Ortega v. Kmart Corp.* (2001) 26 Cal.4th 1200, 1205 [cause of action for premises liability].) Premises liability " 'is grounded in the possession of the premises and the attendant right to control and manage the premises' "; accordingly, " 'mere possession with its attendant right to control conditions on the premises is a sufficient basis for the imposition of an affirmative duty to act.' " (*Preston v. Goldman* (1986) 42 Cal.3d 108, 118, italics omitted, quoting *Sprecher v. Adamson Companies* (1981) 30 Cal.3d 358, 368, 370.) But the duty arising from possession and control of property is adherence to the same standard of care that applies in negligence cases. (*Rowland*, *supra*, 69 Cal.2d at p. 119 ["The proper test to be applied to the liability of the possessor of land . . . is whether in the management

28

of his property he has acted as a reasonable man in view of the probability of injury to others . . . ."]; accord, *Alcaraz v. Vece* (1997) 14 Cal.4th 1149, 1156.) In determining whether a premises owner owes a duty to persons on its property, we apply the *Rowland* factors. (See, e.g., *Thai v. Stang* (1989) 214 Cal.App.3d 1264, 1271 [*Rowland* analysis applies to premises liability cases].) Indeed, *Rowland* itself involved premises liability. (*Rowland*, at p. 110.)

We have never held that the physical or spatial boundaries of a property define the scope of a landowner's liability. The Courts of Appeal have repeatedly concluded that " '[a] landowner's duty of care to avoid exposing others to a risk of injury is not limited to injuries that occur on premises owned or controlled by the landowner.' " (*Garcia v. Paramount Citrus Association* (2008) 164 Cal.App.4th 1448, 1453; see *Barnes v. Black* (1999) 71 Cal.App.4th 1473, 1478 (*Barnes*); *McDaniel v. Sunset Manor Co.* (1990) 220 Cal.App.3d 1, 7–8 (*McDaniel*).) "Rather, the duty of care encompasses a duty to avoid exposing persons to risks of injury that occur off site if the landowner's property is maintained in such a manner as to expose persons to an unreasonable risk of injury off-site." (*Barnes*, *supra*, 71 Cal.App.4th at p. 1478; see *Davert v. Larson* (1985) 163 Cal.App.3d 407, 410 ["A landowner or possessor owes a duty of care to persons who come on his property as well as to persons off the property for injuries due to the landowner's lack of due care in the management of his property."].)

BNSF argues that those cases are distinguishable on the ground that the relevant off-site injuries were due in part to the plaintiff's proximity to the defendant's property, a fact that implicitly establishes a self-limiting principle for finding such liability. Noting that *Garcia*, *Barnes*, and *McDaniel* addressed liability for accidents occurring adjacent to the defendant's property, BNSF says this court has "never expanded premises liability to permit lawsuits by plaintiffs

29

whose only connection to the property at issue is an encounter with someone who visited the site."

Although this last statement is superficially correct, it misconstrues the Havers' theory of negligence. It is not Lynne's contact with *Mike* that allegedly caused her mesothelioma, but rather Lynne's contact with *asbestos fibers that BNSF used on its property*. Mike and his clothing acted as a vector to carry the fibers into Mike and Lynne's home, where she was exposed. The Havers' claim of negligence focuses on an allegedly hazardous condition created and maintained on BNSF's property and BNSF's alleged failure to contain that hazard as a reasonable property owner would have done in the mid-1970s. This claim is readily attributable "to [a] specific condition, natural or artificial," on BNSF's property. (*A. Teichert & Son, Inc. v. Superior Court* (1986) 179 Cal.App.3d 657, 663.)

Indeed, liability for harm caused by substances that escape an owner's property is well established in California law. "The *Rowland* factors determine the scope of a duty of care whether the risk of harm is situated on site or off site." (*Barnes*, *supra*, 71 Cal.App.4th at p. 1479, quoting *McDaniel*, *supra*, 220 Cal.App.3d at pp. 7–8.) We have found that landowners have a duty to prevent hazardous natural conditions arising on their property from escaping and causing injury to adjacent property. (See *Sprecher v. Adamson Companies* (1981) 30 Cal.3d 358 [applying *Rowland* factors to find that an uphill landowner had a duty to correct or control a landslide condition on their land that eventually pushed a downhill landowner's home into a third house, resulting in damages].) A similar rule applies to escaping animals. (See *Davert*, *supra*, 163 Cal.App.3d 407 [finding landowner had a duty to prevent injuries due to a horse's escape from the property and subsequent collision with an automobile]; *Curtis v. State of California ex rel. Dept. of Transportation* (1982) 128 Cal.App.3d 668 [upholding verdict finding the

30

state negligent in constructing defective fences that permitted a cow to escape and create a dangerous condition by entering a public highway].)  And the Courts of Appeal "have consistently held private persons liable for negligently setting fires and for negligently allowing fires to escape to others' properties."  (*Anderson v. United States* (9th Cir. 1995) 55 F.3d 1379, 1381, citing *People v. Southern Pacific Co.* (1983) 139 Cal.App.3d 627, 633–634, and *Gould v. Madonna* (1970) 5 Cal.App.3d 404, 406.)

The cases above do not suggest that the duties of employers and the duties of premises owners are necessarily coextensive.  The law of premises liability includes a number of affirmative defenses and exceptions flowing from the general principle that " '[t]he duties owed in connection with the condition of land are not invariably placed on the person [holding title] but, rather, are owed by the person in possession of the land [citations] because [of the possessor's] supervisory control over the activities conducted upon, and the condition of, the land.' "  (*Alcaraz v. Vece*, *supra*, 14 Cal.4th at p. 1161.)  For example, a landowner "who hired an independent contractor generally [is] not liable to third parties for injuries caused by the contractor's negligence in performing the work."  (*Privette v. Superior Court* (1993) 5 Cal.4th 689, 693; cf. *Van Fossen v. MidAmerican Energy Co.* (Iowa 2009) 777 N.W.2d 689, 698.)  At the same time, the rule is subject to exceptions:  "[T]he hirer as landowner may be independently liable to the contractor's employee, even if it does not retain control over the work, if (1) it knows or reasonably should know of a concealed, preexisting hazardous condition on its premises; (2) the contractor does not know and could not reasonably ascertain the condition; and (3) the landowner fails to warn the contractor."  (*Kinsman v. Unocal Corp.* (2005) 37 Cal.4th 659, 675.)

31

We express no view on whether BNSF can assert one or more of these fact-specific defenses or whether the exceptions under the *Privette* doctrine, which applies to a contractor's employees, also apply to injuries to those employees' family members. No such defense has been alleged. The facts as pleaded, which we must accept as true at this stage (see *Schifando v. City of Los Angeles* (2003) 31 Cal.4th 1074, 1081), are that BNSF's predecessor was not a passive consumer of asbestos but instead had " 'supervisory control' " (*Alcaraz v. Vece*, *supra*, 14 Cal.4th at p. 1158) over the sources of asbestos to which Lynne was exposed. Mike, who carried the asbestos home, was an employee of that predecessor. Under these circumstances, in which BNSF's predecessors are alleged to have engaged in active supervisory control and management of asbestos sources, the Havers' premises liability claim is subject to the same requirements and same duty analysis that apply to a claim of general negligence.

## V.

Looking beyond California law, Abex and BNSF urge us to follow what Abex characterizes as "a growing majority of courts" that have rejected a duty of ordinary care to prevent take-home exposure to asbestos. This argument rests on a mischaracterization of out-of-state precedent. The only courts that have squarely addressed cases of take-home exposure factually comparable to the cases before us, and that have applied general tort law principles commensurate with our own, have reached the same conclusion we do here. All of the cases cited by defendants as failing to find a duty are readily distinguishable.

First, a number of the cases defendants cite address facts different from those presented here. In *Martin v. Cincinnati Gas & Elec. Co.* (6th Cir. 2009) 561 F.3d 439, the Sixth Circuit found "no evidence that either defendant had actual knowledge of the danger of bystander exposure" during a period of alleged exposure spanning the years 1951 through 1963. (*Id.* at pp. 444–445.) But the

32

exposure at issue here occurred in the 1970s, after OSHA had promulgated a standard to address the acknowledged danger of take-home exposure. (OSHA Standard, *supra*, 37 Fed. Reg. 11320.) Decisions of the Illinois Supreme Court and Texas Courts of Appeal are similarly distinguishable. (See *Simpkins v. CSX Transportation*, *Inc.* (Ill. 2012) 965 N.E.2d 1092 [remanding to allow plaintiffs leave to amend the complaint to state enough well-pleaded facts to establish foreseeability]; *Alcoa, Inc. v. Behringer* (Tex.App. 2007) 235 S.W.3d 456, 462 [plaintiff failed to show that "the danger of non-occupational exposure to asbestos dust on workers' clothes was . . . known [or] reasonably foreseeable to Alcoa in the 1950s" and thus Alcoa did not owe a duty to a plaintiff alleging take-home exposure "under the facts of this case"]; but cf. *Dube v. Pittsburgh Corning* (1st Cir. 1989) 870 F.2d 790, 793 [the Navy was "charged with knowledge of the risk [of asbestos] to domestic bystanders as of October 1964" and was negligent in its failure to "consider[] whether those risks justified a warning"], abrogated on other grounds by *Shansky v. U.S.* (1st Cir. 1999) 164 F.3d 688.)

Second, defendants cite a number of product liability suits. The Maryland high court determined that a products manufacturer could not foresee and had no means of preventing take-home exposure as the result of use of its asbestos-containing product in 1969. (See *Georgia Pacific, LLC v. Farrar* (Md. 2013) 69 A.3d 1028, 1039.) But that same court, on the same day, upheld a judgment awarding damages on a product liability and take-home exposure claim and noted that, although the defendants had not challenged the foreseeability of the alleged injury and therefore the court did not address that issue, the fact that exposure "extended well beyond 1972" might alter the foreseeability determination. (*Dixon v. Ford Motor Co.* (Md. 2013) 70 A.3d 328, 330, fn. 1.) More to the point, take-home asbestos cases against employers or premises owners allege that the defendants had direct knowledge as to how fibers were being released and

33

circulated within their facilities and failed to prevent those employees from leaving workplaces *owned or controlled by the defendants* with asbestos on their clothing or persons. Product liability defendants, by contrast, have no control over the movement of asbestos fibers once the products containing those fibers are sold. Because the *Rowland* analyses for these two theories of liability differ significantly, product liability cases are inapposite.

Third, defendants cite cases where the court, in concluding that the defendants did not have a duty to prevent take-home exposure, asserted as a foundational principle of tort liability that a plaintiff and a defendant must have a prior relationship for a duty to exist from the latter to the former. This category includes the New York high court's opinion in *Matter of New York City Asbestos Litigation* (N.Y. 2005) 840 N.E.2d 115, 119. An Illinois appellate court has similarly predicated its finding of no duty on the absence of a relationship between plaintiff and defendant. (*Nelson v. Aurora Equipment Co.* (Ill.App.Ct. 2009) 909 N.E.2d 931, 934.) Other courts have downplayed the significance of foreseeability while embracing a preexisting relationship between plaintiff and defendant as a prerequisite to the establishment of a duty. (See *Gillen v. Boeing Co.* (E.D. Pa. 2014) 40 F.Supp.3d 534, 538–540 [applying Pennsylvania tort law where foreseeability " 'is not necessarily a dominant factor' " and where the fact that parties were " 'legal strangers' " is a significant consideration to hold that plaintiff's husband's employer had no duty to protect plaintiff from asbestos]; *In re Certified Question from Fourteenth District Court of Appeals of Texas* (Mich. 2007) 740 N.W.2d 206, 211 [" 'Duty . . . "concerns the problem of the relation between individuals which imposes upon one a legal obligation for the benefit of the other," ' "]; *id.* at p. 212 ["Although foreseeability is a factor to be considered, '[all] other considerations may be, and usually are, more important.' "].)

34

In California, both legislative policy (section 1714) and this court's long-standing precedent have treated foreseeability as the predominant factor in duty analysis. Although we have held that the existence of a relationship between the plaintiff and defendant is one basis for finding liability premised on the conduct of a third party (see *Davidson v. City of Westminster* (1982) 32 Cal.3d 197, 203–205; *Tarasoff*, *supra*, 17 Cal.3d at pp. 435–436), we have never held that such a relationship is a prerequisite to finding that a defendant had a duty to prevent injuries due to its own conduct or possessory control. Indeed, the irrelevance of the relationship between the plaintiff and the defendant is the central holding of *Rowland*: We squarely rejected the notion that duty analysis should turn on whether the person injured on the owner's or occupier's premises was a trespasser, licensee, or invitee. (*Rowland*, *supra*, 69 Cal.2d at pp. 116–119.) Although "in general" there may be a correlation between the factors relevant to duty analysis and the plaintiff's relationship to a property owner, "there are many cases in which no such relationship may exist" yet proper analysis of the *Rowland* factors would support the existence of a duty. (*Id.* at pp. 117–118.) The New York, Illinois, Pennsylvania, and Michigan authorities are therefore inapplicable to our present analysis, as each begins from a principle of tort law this court has long rejected.

Finally, defendants cite two decisions rejecting take-home asbestos claims by the Delaware Supreme Court. In both cases, the court relied heavily on a distinction between misfeasance and nonfeasance to conclude that an employer's failure to prevent take-home exposure is *non*feasance and thus, in the absence of a "legally significant relationship" between the plaintiff and their spouse's employer, no legal duty existed. (*Riedel v. ICI Americas Inc.* (Del. 2009) 968 A.2d 17, 25–27; see *Price v. E.I. DuPont de Nemours & Co.* (Del. 2011) 26 A.3d 162, 170 [applying same reasoning to a "failure to warn" claim].) The Delaware Supreme Court "decline[d] to adopt . . . the principle that absent a countervailing

35

principle or policy" all actors have a "duty to exercise reasonable care when the actor's conduct creates a risk of physical harm," as stated by section 7 of the Restatement (Third) of Torts, Physical and Emotional Harm. (*Riedel*, *supra*, 968 A.2d at pp. 20–21.) But we have endorsed precisely this principle — and section 7 of the Restatement Third of Torts — as an articulation of California law. (*Cabral*, *supra*, 51 Cal.4th at p. 771 fn. 2). Thus, the Delaware Supreme Court's approach is not informative here because it begins from a plainly different general principle of tort liability.

Against this body of distinguishable precedent stand decisions from two state high courts and one intermediate appellate court that begin with the premise that foreseeability of injury is a significant factor in duty analysis, find that take-home exposure is reasonably foreseeable to employers using asbestos-containing materials, weigh this foreseeability against public policy considerations, and conclude that possessors or employers owe members of a worker's household a duty to prevent take-home exposure. (See *Satterfield v. Breeding Insulation Co.* (Tenn. 2008) 266 S.W.3d 347 (*Satterfield*); *Olivo*, *supra*, 895 A.2d at pp. 1148–1149 [weighing "foreseeability of the risk of harm to that individual or identifiable class of individuals" and considerations of fairness, and concluding that "to the extent [defendant] owed a duty to workers on its premises for the foreseeable risk of exposure to friable asbestos and asbestos dust, similarly, [defendant] owed a duty to spouses handling the workers' unprotected work clothing"]; *Chaisson v. Avondale Industries, Inc.* (La.Ct.App. 2006) 947 So.2d 171, 182, 184 [following *Olivo* on the ground that Louisiana jurisprudence "relie[s] more heavily upon foreseeability," and finding public policy weighs in favor of finding a "duty of a company with knowledge of the presence of asbestos and OSHA's 1972 standards . . . to guard against [plaintiff's] household exposure to asbestos from laundering her husband's work clothes"]; *Zimko v. American Cyanamid* (La.Ct.App. 2005)

36

905 So.2d 465, 483 [finding a "duty to act reasonably in view of the foreseeable risks of danger to household members of its employees resulting from exposure to asbestos fibers carried home on its employee's clothing, person, or personal effects" because inference of this danger was not particularly difficult and was "definable as including the employee's household members"].)

The reasoning of the Tennessee Supreme Court in *Satterfield* is particularly instructive. There the plaintiff had "filed a negligence action against her father's employer, alleging that the employer had negligently permitted her father to wear his asbestos-contaminated work clothes home from work." (*Satterfield*, *supra*, 266 S.W.3d at p. 351.) After finding that the "paramount" factor, foreseeability, weighed in favor of finding a duty (*id.* at p. 366), the court addressed objections by the defendant similar to those raised by Abex and BNSF, i.e., that manufacturers "could face bankruptcy" (*id.* at p. 369), thereby costing jobs, and that finding a duty would invite claims by other plaintiffs against all premise owners (*id.* at pp. 370–371). The court reasoned that failing to assign liability to manufacturers will not eliminate the burden these injuries have caused, but merely leave them on the shoulders of the injured persons and fellow purchasers of health insurance, and "no particular public policy reason[s]" favor allocating costs in this way. (*Id.* at p. 371.) The court concluded that an "employer owed a duty to those who regularly and for extended periods of time came into close contact with the asbestos-contaminated work clothes of its employees to prevent them from being exposed to a foreseeable and unreasonable risk of harm." (*Id.* at p. 352.) The court went on to emphasize that a verdict against a premises owner will always require proof that an injury due to take-home exposure was "reasonably foreseeable" in the particular circumstances of the case, a determination that depends on fact-specific questions of asbestos quantity and the particularized knowledge and sophistication of an individual defendant. (*Id.* at p. 371.)

37

In sum, the holding in this case is consistent with the conclusions of courts that have adopted a general principle of tort liability analogous to section 1714 or that allow recovery, as we did in *Rowland*, for foreseeable categories of injury regardless of the relationship of the parties.  Other courts and scholars, surveying precedent on the issue of take-home exposure, have reached the same conclusion: The different outcomes among state courts reflect underlying differences in the duty doctrine in the respective states, not a split between a majority and a minority position on the ultimate policy issues.  (See *Satterfield*, *supra*, 266 S.W.3d at p. 373; Levine, *Clearing the Air: Ordinary Negligence in Take-Home Asbestos Exposure Litigation* (2011) 86 Wash. L.Rev. 359, 360.)  By holding that section 1714 and *Rowland* analysis establish a duty to prevent take-home exposure that extends to members of a worker's household, we stand in harmony with other courts that have applied similar law to similar facts.

## CONCLUSION

For the reasons above, we reverse the judgment of the Court of Appeal in *Haver* and remand for further proceedings not inconsistent with this opinion. We vacate the judgment of the Court of Appeal in *Kesner* and remand for further proceedings not inconsistent with this opinion, including, if appropriate, a remand to the trial court for the parties to submit additional evidence on whether Johnny Kesner was a member of George Kesner's household for purposes of the duty we recognize here.


LIU, J.


WE CONCUR:

CANTIL-SAKAUYE, C. J.
WERDEGAR, J.
CHIN, J.
CORRIGAN, J.
CUÉLLAR, J.
KRUGER, J.

39

*See last page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** Kesner v. Superior Court and Haver v. BNSF Railway Company
_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 226 Cal.App.4th 251 and 226 Cal.App.4th 1104
**Rehearing Granted**

_____

**Opinion No.** S219534 and S299919
**Date Filed:** December 1, 2016
_____

**Court:** Superior
**County:** Alameda and Los Angeles
**Judge:** John M. True and Richard E. Rico

_____

**Counsel:**

Weitz & Luxenberg, Benno Ashrafi, Cindy Saxey, Josiah W. Parker; Kazan, McClain, Satterley & Greenwood and Ted W. Pelletier for Petitioner and for Plaintiff and Appellant Cecelia Kesner.

Brayton Purcell, Alan R. Brayton, Gilbert L. Purcell and Gary L. Brayton as Amici Curiae on behalf of Petitioner and Plaintiff and Appellant Cecelia Kesner.

The Arkin Law Firm and Sharon J. Arkin for Consumer Attorneys of California as Amicus Curiae on behalf of Petitioner and Plaintiff and Appellant Cecelia Kesner.

Walters Kraus & Paul, Paul C. Cook and Michael B. Gurien for Plaintiffs and Appellants Joshua Haver, et al.

The Arkin Law Firm and Sharon J. Arkin for Consumer Attorneys of California as Amicus Curiae on behalf of Plaintiffs and Appellants Joshua Haver, et al.

No appearance for Respondent Superior Court.

Horvitz & Levy, Lisa Perrochet, Robert H. Wright, Curt Cutting; Brydon Hugo & Parker, Hugo Parker, Edward R. Hugo, James C. Parker and Jeffrey Kaufman for Real Party in Interest and for Defendant and Respondent Pneumo Abex, LLC.

McKenna Long & Aldridge, Lisa L. Oberg; McDermott Will & Emery and Colleen E. Baime for CertainTeed Corporation and Honeywell International Inc., as Amici Curiae on behalf of Real Party in Interest and Defendant and Respondent Pneumo Abex, LLC.

Snell & Wilmer, Mary-Christine Sungaila and Jenny Hua for International Association of Defense Counsel and Federation of Defense & Corporate Counsel as Amici Curiae on behalf of Real Party in Interest and Defendant and Respondent Pneumo Abex, LLC.

**Counsel:**

Fred J. Hiestand for The Civil Justice Association of California as Amicus Curiae on behalf of Real Party in Interest and Defendant and Respondent Pneumo Abex, LLC.

Deborah J. La Fetra for Pacific Legal Foundation as Amicus Curiae on behalf of Real Party in Interest and Defendant and Respondent Pneumo Abex, LLC.

Armstrong & Associates and William H. Armstrong for Resolute Management as Amicus Curiae on behalf of Real Party in Interest and Defendant and Respondent Pneumo Abex, LLC.

Schiff Hardin and Eliot S. Jubelirer for Owens-Illinois, Inc., as Amicus Curiae on behalf of Real Party in Interest and Defendant and Respondent Pneumo Abex, LLC.

Shook, Hardy & Bacon, Mark A. Behrens and Patrick Gregory for Coalition for Litigation Justice, Inc., Chamber of Commerce of the United States of America, National Association of Manufacturers, American Tort Reform Association and NFIB Small Business Legal Center as Amici Curiae on behalf of Real Party in Interest and Defendant and Respondent Pneumo Abex, LLC.

Gordon & Rees and Don Willenburg for Association of Defense Counsel of Northern California and Nevada as Amicus Curiae on behalf of Real Party in Interest and Defendant and Respondent Pneumo Abex, LLC.

Horvitz & Levy, Curt Cutting and Steven Fleischman for Association of Southern California Defense Counsel as Amicus Curiae on behalf of Real Party in Interest and Defendant and Respondent Pneumo Abex, LLC.

Sims Law Firm, Selim Mounedji; Gibson, Dunn & Crutcher, Veronica Lewis, Theodore J. Boutrous Jr., Joshua S. Lipshutz and Alexander M. Fenner for Defendant and Respondent BNSF Railway Company.

Fred J. Hiestand; Erika C. Frank and Heather L. Wallace for The California Chamber of Commerce and The Civil Justice Association of California as Amici Curiae on behalf of Defendant and Respondent BNSF Railway Company.

Shook, Hardy & Bacon, Mark A. Behrens and Patrick Gregory for Litigation Justice, Inc., Chamber of Commerce of the United States of America, National Association of Manufacturers, American Tort Reform Association and NFIB Small Business Legal Center as Amici Curiae on behalf of Defendant and Respondent BNSF Railway Company.

Snell & Wilmer, Mary-Christine Sungaila and Jenny Hua for International Association of Defense Counsel and Federation of Defense & Corporate Counsel as Amici Curiae on behalf of Defendant and Respondent BNSF Railway Company.

Deborah J. La Fetra for Pacific Legal Foundation as Amicus Curiae on behalf of Defendant and Respondent BNSF Railway Company.

**Page 3 – S219534 & S219919 counsel continued**

**Counsel:**

Louis P. Warchot, Daniel Saphire; Murphy, Campbell, Alliston & Quinn and Stephanie L. Quinn for Association of American Railroads as Amicus Curiae on behalf of Defendant and Respondent BNSF Railway Company.

King & Spalding, Peter A. Strotz, Steven D. Park and Ethan P. Davis for Western States Petroleum Association as Amici Curiae on behalf of Defendant and Respondent BNSF Railway Company.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Ted W. Pelletier
Kazan, McClain, Satterley & Greenwood
Jack London Market
55 Harrison Street, Suite 400
Oakland, CA 94607
(510) 302-1000

Lisa Perrochet
Horvitz & Levy
Business Arts Plaza
3601 West Olive Avenue, 8th Floor
Burbank, CA 91505-4681
(818) 995-0800

Michael B. Gurien
Walters Kraus & Paul
222 North Sepulveda Boulevard, Suite 1900
El Segundo. CA 90245
(310) 414-8146

Theodore J. Boutrous Jr.
Gibson, Dunn & Crutcher
333 South Grand Avenue
Los Angeles, CA 90071-3197
(213) 229-7000