Filed 9/10/21  Beltran v. Golden CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| KYLEEAN COZZITORTO BELTRAN, | |
| Plaintiff and Appellant, | G060132 |
| v. | (Super. Ct. No. 2015-1-CV-276960) |
| HEIDI GOLDEN, | O P I N I O N |
| Defendant and Respondent. | |

Appeal from a judgment of the Superior Court of Santa Clara County, Theodore C. Zayner, Judge.  Reversed and remanded.

Haberkorn & Associates, Matthew H. Haberkorn; Andrew J. Kopp; Esner, Chang & Boyer and Andrew N. Chang, for Plaintiff and Appellant.

Rankin Stock Heaberlin Oneal and Jon Allen Heaberlin for Defendant and Respondent.

After being injured when a utility vehicle in which she was riding as a passenger tipped over, plaintiff Kyleean Cozzitorto Beltran sued defendant Heidi Golden alleging negligence. Over plaintiff's objection, the trial court granted summary judgment in favor of defendant after concluding plaintiff did not meet her burden of showing a triable issue of material fact concerning her claims. Plaintiff contends the trial court erred in doing so because the evidence reveals disputed material facts which must be left for determination by a trier of fact. We agree. Defendant had a duty to act as a reasonably prudent person would in her control of the utility vehicle. And, under the specific circumstances in the record before us, there are triable issues of material fact on the issue of whether defendant breached that duty of care. Accordingly, we reverse the judgment.

**FACTS**

*Day of the injury*

The events giving rise to this lawsuit took place at Live Oak High School (LOHS) in the City of Morgan Hill on the morning after overnight graduation festivities were held on campus for graduating students. That morning, parents, at least one teacher, students and other volunteers were cleaning up inside and outside the school's main gymnasium, as well as some surrounding areas where activities had taken place.

Defendant was one of the volunteers on campus that morning. Her children had previously graduated from the high school and after their graduation she continued to remain involved in various capacities. One such capacity was serving as president of the booster organization which supported the school's Future Farmers of America (FFA) program.

Students participating in the FFA program maintained an area on the school's property, referred to as "the farm," where they raised farm animals and grew crops. Once or twice a month, FFA students would participate in a weekend farm cleanup workday. One of the pieces of equipment used on weekend farm workdays, as

2

well as during certain other school functions, was a four-wheel utility vehicle. Commonly known to students and others as the "Mule," the utility vehicle had space to seat people and carry cargo.

Among the LOHS students participating in the post-graduation cleanup were Jessica Pfaendler, Casey Cowern and plaintiff. Pfaendler, who was 18 years old at the time, graduated the previous day but did not attend the overnight graduation festivities. She participated in the FFA program. Cowern and plaintiff, then 14 and 15 years old, respectively, also participated in the FFA program.

At one point during the cleanup, Pfaendler approached defendant. Pfaendler asked if she could use the Mule and defendant said she could. Pfaendler had just seen another newly graduated student parking the Mule outside the gym, so when defendant said she did not know who had the keys, Pfaendler said she could get them.

After getting permission from defendant, Pfaendler went outside to the Mule; she was joined by plaintiff and Cowern. They planned to pick up pig food from a vehicle in the school parking lot and go to the farm to feed their pigs.

Pfaendler drove to the parking lot where the vehicle was parked, they loaded the pig food onto the rear flatbed of the Mule and Pfaendler proceeded across the school campus toward the farm. Shortly thereafter, Cowern asked Pfaendler if she could try driving the Mule. Pfaendler agreed and the girls traded seats.

With Cowern at the wheel, the girls continued towards the farm. As Cowern navigated a turn, the Mule flipped onto its side. All three girls were ejected from the Mule, with plaintiff ending up underneath it. Plaintiff sustained injuries as a result.

Plaintiff filed suit against defendant and others. The complaint alleged two causes of action against defendant, one titled "Motor Vehicle" which alleged negligence, and the other for general negligence. Plaintiff prayed for both compensatory and punitive damages.

Defendant moved for summary judgment,[1] arguing plaintiff's claims failed because plaintiff could not demonstrate defendant knew or should have known Pfaendler, to whom she entrusted the Mule, was incompetent to operate it. She primarily relied on her own deposition testimony, as well as the deposition testimony of Pfaendler, Cowern and plaintiff. Plaintiff opposed the motion, presenting additional deposition testimony which she argued raised triable issues of fact. We summarize the evidence below.

*Defendant's deposition testimony*

Regarding the day plaintiff was injured, defendant confirmed she gave Pfaendler permission to drive the Mule. She explained that while she was inside the main gym, Pfaendler approached her asking for permission to use it. In giving her permission, defendant told Pfaendler, "You and only you, and get right back with it."

As to her past experiences concerning the Mule, defendant testified the Mule was kept in a locked shed in the farm area of campus, and it was used for a variety of things, including farm-related activities, football games, and the student recycling program. She recalled seeing senior LOHS students drive the Mule, but she did not recall whether she had seen someone under 16 years old drive it. Although there was a key which started the Mule, to which she had access, defendant stated it could also be started without one by using a small pin—something she previously observed a student do while on the farm.

*Tanya Bollenbacher's written statement & deposition testimony*

Among the parent volunteers present at the cleanup on the morning plaintiff was injured was Tanya Bollenbacher, mother of a then LOHS student. At defendant's request, Bollenbacher provided a written statement shortly after the incident which

---

[1] Defendant also moved, in the alternative, for summary adjudication. The court denied such request based on procedural irregularities. Defendant did not appeal that denial, so the summary adjudication issue is not before us.

4

detailed her recollection of what had occurred that morning. In it she explained she saw her daughter riding as a passenger in the Mule while it was being driven by another student assisting with cleanup activities. When deposed, Bollenbacher stated her daughter had not asked her for permission to ride the Mule, and she did not expect her to ask for permission "[b]ecause the kids rode on it all the time. [Her daughter] rode on it at football games and stuff[, so] [s]he would have just hopped right on."

After seeing her daughter and the other student get off the Mule, Bollenbacher went inside the main gym and was near defendant when Pfaendler approached. Bollenbacher did not hear what Pfaendler said, but she stated she heard defendant respond to Pfaendler by saying, "You and only you, watch your speed, and you come right back."

*Jessica Pfaendler's deposition testimony*

Pfaendler testified she was participating in the cleanup activities on the morning in question when plaintiff and Cowern approached her. Plaintiff asked if Pfaendler would ask defendant to use the Mule. Pfaendler found defendant inside a kitchen located adjacent to the main gym and asked her if "she could use the [M]ule to take [Cowern] and [plaintiff] to feed their pigs at the farm." Defendant told her she could, so she went outside to the Mule where she was joined by the other two girls. Pfaendler did not recall defendant telling her that only she could drive the Mule and stated that she would have remembered if defendant had made such a statement. She also stated she did not remember anyone else, including Bollenbacher, being in the room when she spoke with defendant.

Additionally, Pfaendler testified about historic practices concerning the Mule. She relayed the Mule was stored in a shed on the farm area of the school's campus, and it was most often used on weekend farm workdays. Pfaendler occasionally observed defendant's husband using it on the farm. She also saw other students using it

5

without any adult passenger while in the presence of defendant and/or the then LOHS FFA teacher advisor, Erin Larrus.

Prior to the date at issue, Pfaendler had been a passenger on the Mule while other students drove and had driven the Mule herself. She explained she drove the Mule between six and eight times without an adult passenger, the first time being when she was a 14- or 15-year-old freshman. Each time she drove it, she received prior permission from defendant or Larrus, with the former being the one whose permission she sought more often. Those two individuals were the ones who other students also approached to ask for permission to use the Mule. Neither defendant nor Larrus ever asked Pfaendler whether she had a driver's license, and neither ever explained nor taught her how to drive the Mule. However, Pfaendler stated that on a couple of the prior occasions she drove the Mule with defendant's permission, defendant conveyed that she was the only one allowed to drive it.

*Plaintiff's deposition testimony*

Plaintiff stated that on the day she was injured, she was exiting the main gym when she saw a recently graduated student pull up in the Mule, park it and get off. Thereafter, Pfaendler approached plaintiff asking if she and Cowern wanted to go to the farm to feed the pigs. She gave an affirmative response, and Pfaendler said she would go ask defendant to use the Mule. Pfaendler returned after asking and said to plaintiff, "Let's go."

Regarding historical practices surrounding the Mule, plaintiff testified defendant told her she purchased and owned the Mule. She separately had such impression because defendant was the one students would approach for permission to drive it and she saw defendant using it "every time" defendant was at the farm. She further stated students would drive it with or without permission because the keys would be left in it. Plaintiff had previously driven the Mule on two different weekend farm

6

workdays when Pfaendler agreed to let her drive. There was no adult passenger with her when she drove it. Although defendant was present at the farm both times, plaintiff could not recall if defendant saw her driving the Mule.

*Casey Cowern's deposition testimony*

Like plaintiff and Pfaendler, Cowern testified about past practices regarding the Mule and about the day plaintiff was injured. With respect to the former, she explained the Mule was usually stored in a shed located on the farm area of campus and used on the farm when defendant was present because defendant and her husband had the key to it. Cowern recalled the shed would stay locked and the Mule would not be used when defendant was not present on a weekend farm workday. On the occasions she saw it used, she observed defendant, defendant's husband and students separately drive it.

Regarding the day of the incident, Cowern testified that after Pfaendler got permission from defendant to drive the Mule, Pfaendler told her defendant "said not to mess around on it, and only [Pfaendler] can drive."

*Thomas Copeland's deposition testimony*

Plaintiff's brother, Thomas Copeland, testified what he observed when he was at the farm on a few of the weekend farm workdays. He approximated he saw three students driving the Mule on those occasions, one being Pfaendler. Copeland further explained that when Pfaendler drove it on a weekend farm workday about two months prior to the day plaintiff was injured, his three kids, a cousin, plaintiff and another LOHS student rode as passengers on the rear flatbed of the Mule. He stated defendant was present on the farm that day.

*Trial court's ruling on defendant's motion for summary judgment*

The trial court held a hearing on defendant's motion, took the matter under submission and later issued an order granting summary judgment. It concluded

defendant met her initial burden as to each cause of action and plaintiff did not demonstrate any triable issue of fact. Plaintiff timely appealed following entry of judgment.

## DISCUSSION

Plaintiff asserts the trial court erred because she demonstrated there are triable issues of material fact as to three separate theories of negligence liability which she describes as follows: (1) special circumstance liability related to unlocked, unsecured vehicles left with keys in the ignition; (2) negligent entrustment with express permission; and (3) negligent entrustment with implied permission. We disagree as to the first theory of negligence, but we agree there are triable issues of fact regarding plaintiff's two other negligence based theories.

*A. Summary judgment principles and standard of review*

"The purpose of the law of summary judgment is to provide courts with a mechanism to cut through the parties' pleadings in order to determine whether, despite their allegations, trial is in fact necessary to resolve their dispute. [Citation.]" (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843 (*Aguilar*).) "[A]ny party to an action, whether plaintiff or defendant, 'may move' the court 'for summary judgment' in his favor . . . ." (*Ibid.*) "The court must 'grant []' the 'motion' 'if all the papers submitted show' that 'there is no triable issue as to any material fact' . . . and that the 'moving party is entitled to a judgment as a matter of law.'" (*Ibid.*, citations omitted.) "'The summary judgment procedure, inasmuch as it denies the right of the adverse party to a trial, is drastic and should be used with caution.'" (*Osborn v. Hertz Corp.* (1988) 205 Cal.App.3d 703, 708.)

The party opposing summary judgment may defeat the motion by demonstrating there is a triable issue of material fact. (*Aguilar, supra*, 25 Cal.4th at p. 849.) The opposing party "'may not rely upon the mere allegations or denials' of his

8

'pleadings to show that a triable issue of material fact exists but, instead,' must 'set forth the specific facts showing that a triable issue of material fact exists as to that cause of action . . . .'" (*Ibid.*)

"'On review of an order granting or denying summary judgment, we examine the facts presented to the trial court and determine their effect as a matter of law.' [Citation.] We review the entire record, 'considering all the evidence set forth in the moving and opposition papers except that to which objections have been made and sustained.' [Citation.] Evidence presented in opposition to summary judgment is liberally construed, with any doubts about the evidence resolved in favor of the party opposing the motion. [Citation.]" (*Regents of University of California v. Superior Court* (2018) 4 Cal.5th 607, 618.) Credibility determinations and the weighing of evidence are not proper matters. (*Kids' Universe v. In2Labs* (2002) 95 Cal.App.4th 870, 880; *ARTS Productions, Inc. v. Crocker National Bank* (1986) 179 Cal.App.3d 1061, 1065.) Similarly, there is to be no resolving of fact issues. (*Calemine v. Samuelson* (2009) 171 Cal.App.4th 153, 161.)

"[T]he trial court's stated reasons for granting summary judgment 'are not binding on us because we review its ruling, not its rationale.'" (*Johnson v. Open Door Community Health Centers* (2017) 15 Cal.App.5th 153, 157.) We affirm the summary judgment if correct on any of the grounds asserted in the moving party's motion. (*American Meat Institute v. Leeman* (2009) 180 Cal.App.4th 728, 747-748.)

## B. *General negligence principles*

"'A tort, whether intentional or negligent, involves a violation of a legal duty, imposed by statute, contract or otherwise, owed by the defendant to the person injured. Without such a duty, any injury is "damnum absque injuria"—injury without wrong. [Citations.]' [Citation.] Thus, in order to prove facts sufficient to support a finding of negligence, a plaintiff must show that defendant had a duty to use due care,

that he breached that duty, and that the breach was the proximate or legal cause of the resulting injury." (*Nally v. Grace Community Church* (1988) 47 Cal.3d 278, 292, italics omitted (*Nally*).)

"'Duty is a question of law for the court, to be reviewed de novo on appeal.' [Citation.] 'California law establishes the general duty of each person to exercise, in his or her activities, reasonable care for the safety of others. [Citation.]' [Citation.] Civil Code section 1714, subdivision (a) provides in relevant part: 'Everyone is responsible, not only for the result of his or her willful acts, but also for an injury occasioned to another by his or her want of ordinary care or skill in the management of his or her property or person, except so far as the latter has, willfully or by want of ordinary care, brought the injury upon himself or herself.' . . . '"Courts . . . invoke[ ] the concept of duty to limit generally 'the otherwise potentially infinite liability which would follow from every negligent act . . . .'"' [Citation.] The conclusion that a defendant did not have a duty constitutes a determination by the court that public policy concerns outweigh, for a particular category of cases, the broad principle enacted by the Legislature that one's failure to exercise ordinary care incurs liability for all the harms that result. . . . '[I]n the absence of a statutory provision establishing an exception to the general rule of Civil Code section 1714, courts should create one only where "clearly supported by public policy."'" (*Kesner v. Superior Court* (2016) 1 Cal.5th 1132, 1142-1143 (*Kesner*).)

Whether policy considerations weigh in favor of an exception to the general duty rule requires the careful evaluation and balancing of various factors set forth by the Supreme Court in *Rowland v. Christian* (1968) 69 Cal.2d 108, 112. (*Cabral v. Ralphs Grocery Co.* (2011) 51 Cal.4th 764, 771 (*Cabral*).) The factors include "the 'foreseeability of harm to [the injured party], the degree of certainty that [he] suffered injury, the closeness of the connection between [a defendant's] conduct and the injury suffered, the moral blame attached to [a defendant], the policy of preventing future harm,

the extent of the burden to the [defendant] and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved.'" (*Nally, supra*, 47 Cal.3d at p. 293.) These factors effectively fall into two larger categories: (1) foreseeability of the relevant injury (foreseeability, certainty, & the connection between the plaintiff & the defendant); and (2) public policy considerations (moral blame, preventing future harm, burden, & availability of insurance). (*Kesner, supra*, 1 Cal.5th at p. 1145.)

"Because Civil Code section 1714 establishes a general duty to exercise ordinary care in one's activities . . . [courts] rely on [the *Rowland*] factors not to determine 'whether a *new duty* should be created, but whether an *exception* to Civil Code section 1714 . . . should be created.'" (*Kesner, supra*, 1 Cal.5th at p. 1143.)

"'"In the absence of 'overriding policy considerations . . . foreseeability of risk [is] of . . . primary importance in establishing the element of duty.' [Citations.] . . . '[T]he risk reasonably to be perceived defines the duty to be obeyed.'"'" (*Lindstrom v. Hertz Corp.* (2000) 81 Cal.App.4th 644, 649 (*Lindstrom*).) In evaluating duty, the court's task "'is not to decide whether a *particular* plaintiff's injury was reasonably foreseeable in light of a *particular* defendant's conduct, but rather to evaluate more generally whether the category of negligent conduct at issue is sufficiently likely to result in the kind of harm experienced that liability may appropriately be imposed . . . .'" (*Cabral, supra*, 51 Cal.4th at p. 772; see also *Kesner, supra*, 1 Cal.5th at p. 1143 [*Rowland* factors should be evaluated "'at a relatively broad level of factual generality'"].) "'[L]egal duties are not discoverable facts of nature, but merely conclusory expressions that, in cases of a particular type, liability should be imposed for damage done.'" (*Hoff v. Vacaville Unified School Dist.* (1998) 19 Cal.4th 925, 933.)

If the court determines a duty exists, the fact finder is then charged with deciding whether the specific defendant breached the duty vis-à-vis the specific plaintiff, and with making determinations concerning the elements of causation and damages.

11

(*Cabral, supra*, 51 Cal.4th at pp. 772-773.) "[A] jury's [evaluation] of each must take into account the particular context in which any act or injury occurred." (*Kesner, supra*, 1 Cal.5th at p. 1144.)

*C. Plaintiff's special circumstance negligence liability theory*

Plaintiff's first asserted negligence theory, special circumstance liability, relies on several cases involving the securing of unattended vehicles. "[O]rdinarily the only appreciable risk that [a vehicle] will be set in motion if . . . left unattended arises from the possibility of [it] being stolen" (*Richardson v. Ham* (1955) 44 Cal.2d 772, 776 (*Richardson*)), and there is no general duty to take steps to protect against injury by an adult thief (*Richards v. Stanley* (1954) 43 Cal.2d 60, 65-66 (*Richards*)). Some situations, however, involve "special circumstances" in which there is a foreseeable risk of noncriminal intermeddling likely to cause injury which gives rise to a duty to use ordinary care to prevent injurious misuse of the vehicle. (*Richardson,* at p. 776.)

Examples of cases in which courts have recognized the existence of such special circumstances, and have thus confirmed a duty to use ordinary care, include: (1) cases involving an unattended vehicle left with keys inside under circumstances in which it was foreseeable an incompetent driver might meddle with it (see, e.g., *Palma v. U.S. Industrial Fasteners, Inc.* (1984) 36 Cal.3d 171, 185-186 [keys left in unlocked truck parked overnight on street in industrial area with high crime rate and populated by transients]; *Hergenrether v. East* (1964) 61 Cal.2d 440, 445 [unlocked vehicle left with keys in ignition for long period of time in neighborhood "heavily populated by drunks"]; *Richards, supra*, 43 Cal.2d at p. 66 [dicta describing vehicle left with keys in ignition in front of school]; *Murray v. Wright* (1958) 166 Cal.App.2d 589, 592 [keys left in all unlocked cars on used car lot open to general public]); and (2) cases involving heavy construction machinery which poses an extreme danger when set into uncontrolled motion and which is likely to arouse curiosity and attract spectators who ordinarily will

not know how to operate it (see, e.g., *Richardson v. Ham* (1955) 44 Cal.2d 772, 776 [bulldozer]; *Ballard v. Uribe* (1986) 41 Cal.3d 564, 573 [aerial manlift].)

Here, this theory of liability fails, in the very least, because there is no evidence to support it. There is no evidence Cowern ended up behind the wheel of the Mule because she found it sitting unattended with the keys left in it. Nor is there evidence anyone else did so and subsequently passed the driving responsibilities to Cowern. Instead, it is undisputed Pfaendler asked for defendant's permission to drive the Mule, and only after receiving such permission did Pfaendler take the Mule and eventually cede the wheel to Cowern. Simply put, this is not a keys-in-the-ignition case or one involving the means in which a vehicle was secured when not in use.

## D. *Plaintiff's general negligence and negligent entrustment liability theories*

Plaintiff labels her second and third asserted negligence theories as varieties of negligent entrustment, though her complaint alleged both general negligence and negligent entrustment. On the record before us, and setting aside the specific labels, we conclude plaintiff presented triable issues of material fact which were not appropriate for resolution at the summary judgment stage.

Negligent entrustment is a theory of direct negligence liability which stems from the common law. (*Allen v. Toledo* (1980) 109 Cal.App.3d 415, 419 (*Allen*).) "Witkin describes the tort of negligent entrustment as imposing liability on one who supplies an instrumentality to an incompetent person under circumstances indicating a likelihood of misuse. [Citation.] Prosser states: 'It is the negligent entrusting which creates the unreasonable risk; and this is none the less when the goods are conveyed.' [Citation.]" (*Talbott v. Csakany* (1988) 199 Cal.App.3d 700, 706.)

In the context of vehicles, ""'[i]t is generally recognized that one who places or entrusts his [or her] [] vehicle in the hands of one whom he [or she] knows, or from the circumstances is charged with knowing, is incompetent or unfit to drive, may be

13

held liable for an injury inflicted by the use made thereof by that driver, provided the plaintiff can establish that the injury complained of was proximately caused by the driver's disqualification, incompetency, inexperience or recklessness. . . . [¶ ] "Liability for the negligence of the incompetent driver to whom a[] [vehicle] is entrusted does not arise out of the relationship of the parties, but from the act of entrustment of the [] vehicle, with permission to operate the same, to one whose incompetency, inexperience, or recklessness is known or should have been known to the owner." [Citations.] [¶ ] Under the theory of "negligent entrustment," liability is imposed on vehicle owner or permitter because of his [or her] own independent negligence and not the negligence of the driver, in the event plaintiff can prove that the injury or death resulting therefrom was proximately caused by the driver's incompetency.'" (*Osborn v. Hertz Corp*. (1988) 205 Cal.App.3d 703, 708-709.)

"'Liability for negligent entrustment is determined by applying general principles of negligence, and ordinarily it is for the jury to determine whether the owner [or other entruster] has exercised the required degree of care.' [Citation.] . . . 'In its simplest form the question is whether the owner [or other supplier] when he permits an incompetent or reckless person, whom he knows to be incompetent or reckless, to take and operate his car [or any other instrumentality], acts as an ordinarily prudent person would be expected to act under the circumstances.'" (*White v. Inbound Aviation* (1999) 69 Cal.App.4th 910, 920 (*White*).)

Plaintiff contends entrustment can be demonstrated by express or implied permission and the evidence revealed triable issues of fact as to both. So her argument goes, substantial evidence from which a jury could conclude defendant impliedly entrusted the Mule to Cowern includes the testimony of Pfaendler and others that students, some as young as 14 years old, often drove the Mule in defendant's presence on weekend farm workdays without objection by defendant. And, according to plaintiff, evidence of express permission given to Pfaendler under circumstances in which it was

14

foreseeable she might allow an incompetent minor to drive is additional substantial evidence from which a jury could find defendant was negligent.

Defendant's counter is fourfold. First, she claims the theories urged by plaintiff on appeal exceed those alleged in the complaint. Second, she contends the duty under a negligent entrustment theory does not extend beyond ensuring the person to whom the vehicle is entrusted—i.e., Pfaendler—is competent and fit to drive. Third, she asserts the evidence does not establish it was reasonably foreseeable a younger, unfit person would end up behind the wheel of the Mule. Fourth, she argues there is no evidence defendant gave implied permission to Cowern.

With respect to the proper scope of the issues to be resolved at summary judgment, the pleadings play a key role. "'[T]he scope of the issues to be properly addressed in [a] summary judgment motion' is generally 'limited to the claims framed by the pleadings.'" (*Jacobs v. Coldwell Banker Residential Brokerage Co.* (2017) 14 Cal.App.5th 438, 444.) A moving defendant is not required to go beyond the allegations in the operative complaint, and similarly, an opposing plaintiff may not assert claims or theories not encapsulated by the complaint's allegations. (*Ibid.*)

Here, a fair reading of the complaint's allegations reveals two theories of liability—negligent entrustment and general negligence. As the parties and the trial court recognized, the factual allegations for both theories overlap. They generally allege plaintiff was injured when the Mule in which she was a passenger crashed, the Mule was being operated by an unlicensed minor (Cowern) at the time, defendant was supervising plaintiff and Cowern during the graduation cleanup activities, defendant exercised control and possession of the Mule, and defendant negligently entrusted the Mule. The arguments made by plaintiff below and on appeal fit within those allegations.

As for the substance of plaintiff's theories, we recognize California cases discussing negligent entrustment generally focus on the competence and fitness of the immediate entrustee. (See *Lindstrom, supra*, 81 Cal.App.4th 644, 649; *Dodge Center v.*

15

*Superior Court* (1988) 199 Cal.App.3d 332, 338; *Allen, supra*, 109 Cal.App.3d at pp. 419-420.) But none of the cases have expressly so limited potential liability. There is good reason. Irrespective of the specific label given to a cause of action in the complaint, negligence liability does not end there.

Applying general principles of negligence as we must (*White, supra*, 69 Cal.App.4th at p. 920), because defendant indisputably exercised authority and control over the Mule and regularly decided who was allowed to drive it, we conclude defendant had a duty to exercise ordinary care in her control of it. (See Civ. Code, § 1714, subd. (a); *Pedeferri v. Seidner Enterprises* (2013) 216 Cal.App.4th 359, 366 (*Pedefferi*) ["[T]he basic tenet of California law [is] that 'everyone is required to use ordinary care to prevent causing injury to others'"].) This duty included exercising ordinary care in determining whether, and under what circumstances, someone could drive the Mule.

Defendant urges us to look no further than her entrustment of the Mule to Pfaendler, a licensed and competent driver, seemingly implying any duty defendant owed ends there. Though unclear, to the extent defendant urges us to create a categorical exemption to the ordinary duty standard for situations in which a person entrusts a vehicle to someone who subsequently allows another person to drive and an injury results, we decline to do so. The *Rowland* foreseeability and public policy factors do not weigh in favor of such an exemption.

Creating an outright exemption would mean a person who owns or controls a vehicle could never be held liable for negligence, irrespective of all the surrounding circumstances and foreseeability of injury, so long as the person to whom they entrust the vehicle is a licensed and safe driver. Such an outcome would be directly inconsistent with the policies underlying negligence liability. (See *Kesner, supra*, 1 Cal.5th at p. 1144 [court will not "'carv[e] out an entire category of cases from th[e] general duty rule' . . . unless doing so 'is justified by clear considerations of policy'"]; *Cabral, supra*, 51 Cal.4th at p. 781 [The overall policy of preventing future harm is ordinarily served, in

16

tort law, by imposing the costs of negligent conduct upon those responsible]; *Pedeferri, supra*, 216 Cal.App.4th at p. 366 ["Foreseeability is the '". . . chief factor in [the] duty analysis."'"]; accord *Henderson v. Professional Coatings Corp.* (1991) 72 Haw. 387, 399-400 [819 P.2d 84, 92] [person in control of vehicle may be negligent if he or she knows or has reason to know person to whom vehicle is entrusted would act unreasonably by loaning vehicle to another person who would negligently operate it]; *Rogers v. Kazee* (Ohio Ct. App. 1983) 10 Ohio App.3d 139, 141 [460 N.E.2d 1149, 1152] ["Liability can be imposed on a car owner for the negligent actions of an entrustee of the original entrustee if it can be shown that the original entrustment was negligent"]; *Western Nat. Mut. Ins. Co. v. Auto-Owners Ins. Co.* (1974) 300 Minn. 401, 406 [220 N.W.2d 362, 365-366] [parent liable when parent allows child to use vehicle and injury results after child subsequently permits another minor to drive].)

Contrary to defendant's assertion, finding the existence of such a duty does not open a pandora's box of potential liability for vehicle owners and those who exercise control over them. Recognizing a duty merely requires such persons to do as everyone is tasked under the law—to exercise, in his or her activities, reasonable care for the safety of others. And liability will only result if, inter alia, it is determined there was a failure to act as a reasonably prudent person would under case specific circumstances.

Rather than an issue of duty, the crux of this case rests in the elements of breach and causation. As for the latter, defendant's summary judgment motion did not call into question the element of causation, so it would not be a proper basis for granting summary judgment.[2] (*Y.K.A. Industries, Inc. v. Redevelopment Agency of City of San*

_____

[2] Had defendant challenged the element of causation based on the same evidence in the record before us, we would conclude plaintiff demonstrated a triable issue of fact as to that element. In a negligence action, the element of causation generally requires a "showing that (1) the defendant's breach of its duty to exercise ordinary care was a substantial factor in bringing about plaintiff's harm, and (2) there is no rule of law relieving the defendant of liability." (*Ortega v. Kmart Corp.* (2001) 26 Cal.4th 1200, 1205.) To be a substantial factor means there is some substantial link or nexus between

17

*Jose* (2009) 174 Cal.App.4th 339, 353-354.)  Regarding the element of breach, we agree with plaintiff there are triable issues of material fact.

When it comes to breach, the question is whether defendant failed to act as a reasonably prudent person in her position would be expected to act under the specific circumstances.  (See *Orey v. Superior Court* (2013) 213 Cal.App.4th 1241, 1255 ["The general standard of care is 'that of a reasonably prudent person under like circumstances'"].)  One key aspect of this is whether it was foreseeable Pfaendler would cede the wheel to an incompetent or unfit minor.  (See *Cabral, supra*, 51 Cal.4th at p. 773 [jury considers likelihood or foreseeability of injury in determining whether particular defendant was negligent].)  The parties presented conflicting evidence.

Defendant offered evidence she told Pfaendler, on the day of the injury and on prior occasions, that Pfaendler was the only one allowed to drive the Mule.  But such evidence could be interpreted in more than one way.  On one hand, it could be viewed as defendant taking a step to limit who would end up behind the wheel of the Mule.  On the other hand, it could be seen as evidencing foreseeability of an unfit second driver.  If defendant did not have reason to know Pfaendler might allow another student to drive the

---

defendant's act or omission and plaintiff's injury.  (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 778.)

We cannot say the only reasonable conclusion is an absence of causation, meaning the issue is a factual question to be resolved by the trier of fact.  (*Onciano v. Golden Palace Restaurant, Inc*. (1990) 219 Cal.App.3d 385, 395.)  And although Pfaendler independently made a choice to allow Cowern to drive the Mule, that fact does not automatically absolve defendant of potential liability.  ""If the realizable likelihood that a third person may act in a particular manner is the hazard or one of the hazards which makes the actor negligent, such an act whether innocent, negligent, intentionally tortious or criminal does not prevent the actor from being liable for harm caused thereby.""  (*Peterson v. San Francisco Community College Dist.* (1984) 36 Cal.3d 799, 808.)  Such is the case here because the very hazard which could lead a trier of fact to conclude defendant was negligent is the likelihood Pfaendler might allow an incompetent or unfit minor to drive the Mule.

Mule, she would have had no reason to caution Pfaendler she was the only one permitted to drive it.

In addition, Pfaendler testified she did not remember defendant making such a statement on the day in question. She further stated she would remember if defendant had so cautioned, and she explained no one was in the room when she spoke with defendant, including Bollenbacher who claimed to have overheard defendant's statement. Pfaendler also testified she told defendant she would be using the Mule to go to the farm area of campus with plaintiff and Cowern.

There was also conflicting evidence regarding defendant's awareness, if any, of past practices relating to the Mule's use by LOHS students. Defendant did not recall whether she had seen someone under 16 years old drive the Mule. However, multiple people testified students of all ages often drove the Mule on weekend farm workdays, both with and without permission, and that defendant was present on those days. One parent even stated she would not have expected her daughter to ask to ride the Mule because students "rode on it all the time[,]" so they would "just hop[] right on." Other testimony showed Pfaendler and plaintiff each drove the Mule for the first time when they were 14 or 15 years old and on a weekend farm workday when defendant was at the farm. Further, plaintiff testified the two times she drove the Mule on a weekend farm workday, defendant was present and Pfaendler was the one who let her drive. Pfaendler remained in the Mule as a passenger on at least one of the two occasions.

Simply put, the conflicting evidence presented to the trial court demonstrates triable issues of material fact on the challenged issue of breach.

Our decision today is not that defendant was, in fact, negligent and that her negligence was an actual and legal cause of plaintiff's injury. Rather, we simply conclude the evidence was such that plaintiff's case must live to see another day. It was error for the trial court to grant summary judgment in favor of defendant.

19

## DISPOSITION

The judgment is reversed.  Plaintiff is entitled to costs on appeal.


THOMPSON, J.

WE CONCUR:


O'LEARY, P. J.


MOORE, J.