Filed 7/23/24  Long v. City of Exeter CA2/6
Opinion following transfer from Supreme Court

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| BETTY LONG, et al., <br><br> Plaintiffs and Respondents, <br><br> v. <br><br> CITY OF EXETER, et al., <br><br> Defendants and Appellants. | 2d Civil No. B316324 <br> (Super. Ct. No. 17CV-0529) <br> (San Luis Obispo County) <br><br> OPINION ON TRANSFER FROM THE SUPREME COURT |

A city police department sold an attack-trained police service dog to the officer who had been its handler and who was resigning from the department to take a job as a police officer in another city.  Six months later, the dog escaped from the officer's fenced yard and attacked two innocent people on their front yards, killing one and permanently injuring the other.  A jury found the city's police chief and the supervisor of its canine unit negligently failed to warn the officer that the dog could not unlearn its attack training, would remain dangerous, should be confined in a kennel, and could not safely be treated as a pet.  It awarded the surviving plaintiff $12.5 million in damages and the

deceased victim's survivors damages of $7 million.  It apportioned fault for these damages at 42% for the supervisor of the canine unit, 41.5% for the police chief and 16.5% for the former officer who owned the dog.  The city and its employees appeal, contending they owed no duty to the plaintiffs, the trial court erred when it denied leave to amend the city's answer to allege an affirmative defense, and the damages awarded were excessive.

Originally, we reversed the judgment, concluding appellants owed no duty to provide a more explicit and robust warning to the officer about the dangerousness of the service dog or the conditions under which it should be kept.  We affirmed a December 11, 2020 order awarding sanctions of $5,000 against appellants' counsel after counsel unsuccessfully opposed motions for protective orders.

Our Supreme Court granted review.  It then transferred the matter to this court with directions to vacate our decision and "reconsider the cause in light of *Kuciemba v. Victory Woodworks, Inc.* (2023) 14 Cal.5th 993, 1015 (*Kuciemba*) ["The assertion that a special relationship is required misapprehends our case law"].)" (*Long v. City of Exeter* (2024) 2024 Cal.LEXIS 2182, S283966.)

Having done so, we reach the same result.  *Kuciemba* held that Civil Code section 1714 imposes a duty of care, even in the absence of a special relationship, where the defendant's own conduct, rather than that of a third party, created or increased the risk of harm to plaintiffs.  *(Kuciemba, supra,* 14 Cal.5th at pp. 1016-1017.)  However, where the defendant "did not create or contribute to the risk . . . the default duty rule of Civil Code section 1714 [does] not apply, and the starting point for our analysis [is] instead the alternate rule that generally '"one owes no duty to control the conduct of another, nor to warn those endangered by such conduct."  [Citation.]'  [Citations.]  Under

2

those circumstances, . . . the law does not impose a duty to control, warn, or protect unless there is a special relationship between the parties that "'gives rise to a duty to act.'" [Citations.]" (*Id.* at p. 1017.) Here, respondents' theory was that appellants failed to protect them from the danger created by the handler/owner's negligent care and maintenance of the dog by failing to warn the handler/owner that the dog would remain dangerous and could not safely be kept as a pet. *Kuciemba* does not mandate that we recognize a duty of care under these circumstances in the absence of a special relationship between the parties. We conclude appellants owed no duty to protect respondents from the risk of harm created by the dog handler/owner's negligent care and maintenance of the dog.

*Facts*

<u>The Exeter Police Department's K9 Program</u>

The City of Exeter police department (the Department) hired Alex Geiger as a police officer in August 2014. After completing a one-year probationary period, Geiger applied to become a canine handler. His application was accepted by the supervisor of the canine unit, Sgt. Brett Inglehart.

The Department purchases dogs for its canine unit from Jay Brock, the owner and operator of Top Dog Training Center. Brock also trains both the dogs and the dog handlers. He delivered Neo, a young male Belgian Malinois, to Geiger's home. The Department supplied Geiger with a kennel, a food dish, a special patrol car and other supplies needed for Neo's training and maintenance.

Along with the dog, Geiger received a set of written instructions from Brock detailing how Neo should be treated during the "bonding" period, and a separate set of written instructions for use during the training courses. During the

3

bonding period, Geiger agreed that he would be the only person to feed and groom Neo, and that he would spend "'quiet time/bonding time' with the dog, i.e., sitting quietly with the dog (on leash and/or in a strictly controlled environment, i.e., fenced yard, etc., but not inside the kennel)." He was warned and agreed that Neo would remain kenneled "at all times when the handler is not personally present to control the dog . . ." and that he would read an article about having a police service dog in the home. During the training courses, Geiger agreed that he would be the only person to give Neo commands and the only person to feed, groom and care for Neo. He was further warned and agreed to keep Neo "on lead" at all times unless secured in the patrol vehicle or kennel. In addition, he was warned and agreed that Neo would remain kenneled while at home and would not have "direct interaction with other dogs, pets, etc."

Geiger and Neo spent about three weeks bonding before beginning the training courses with Brock. Neo was trained both to search for narcotics ("search training") and to search for and apprehend people ("patrol training"). According to Brock's syllabus, training in each discipline would consist of 200 hours of hands-on work and 40 hours of classroom time. Log sheets from Geiger's training, however, documented only 54 to 70 hours of hands-on patrol training with Neo and about 100 hours of narcotics search training. Geiger received no classroom instruction.

After receiving certificates of completion for the initial training, Geiger and Neo participated in weekly training with other canine teams in the Department. In addition, Brock scheduled and conducted monthly training sessions for canines

4

and handlers in the Department and other police departments in the area.  Geiger attended these sessions.

Brock explained that dogs are trained to search for a suspect on their handler's command and then to "bite and hold" the suspect.  This means that, when the dog reaches the suspect and is commanded to bite, it will "bite the location that's closest to them, and they hold onto that spot until the handler orders them to release."  Dogs are taught to use their full mouth to bite and grasp the suspect and then continue to hold the suspect until commanded to release.  Because patrol trained dogs are taught that it is acceptable to bite a human, they are potentially dangerous and unpredictable when not under the direct control of their handler.

Geiger began patrolling with Neo in December 2015.  He was never required to deploy Neo to apprehend a person during that time.  Geiger testified that he understood Neo needed to remain in his kennel unless he was working or exercising with Geiger.  Neo was trained to understand that he was working whenever he was outside his kennel; when he was in the kennel, Neo knew it was time to relax.  Geiger testified that Sgt. Inglehart never said anything to him about allowing Neo to play with other dogs.  So, when Neo was not in his kennel, Geiger would allow him to play with his pet German Shepherd, a female named Rolo.

Geiger Resigns and Purchases Neo.

In the summer of 2016, Geiger accepted a police officer position with the Grover Beach Police Department.  He wanted to continue working as a canine handler, but learned before he left the Department that Grover Beach was not interested in forming a canine unit.  Sgt. Inglehart initially told Geiger that he could

buy Neo from the Department, they could try to pair Neo with another handler, or they could euthanize Neo. Geiger was later told that Brock did not think Neo would bond with a new handler, so the only options were for Geiger to purchase the dog, or for Neo to be euthanized.

Brock testified that Inglehart never spoke to him about pairing Neo with a different handler. He learned about Geiger's purchase of Neo only after it was completed. Brock believed it was not unusual for a police service dog to be retrained to work with a new handler. He opined that Neo could have bonded with a new handler.

Sgt. Inglehart testified that a retired police service dog should be handled and cared for in the same way as a working canine. In Inglehart's opinion, a retired police service dog should be kept in a kennel or crate unless in the direct control or presence of the handler. A retired police service dog should not, Inglehart believed, be treated as a pet.

Inglehart testified that Geiger was warned, "through his training and the fact that the dog was living with him, and his experience," that Neo would continue to be a potentially dangerous animal, even if Neo was no longer working. "The training constitutes warning." When Inglehart was asked whether he gave any warnings to Geiger, he replied, "I believe he was warned." The Department admitted in discovery that Inglehart did not further warn Geiger that Neo would continue to be dangerous after he was retired as a working canine.

Inglehart did not know whether anyone from the Department expressly warned Geiger that Neo should not be treated like a pet or that he should be kept in a kennel unless under Geiger's direct control. He believed Geiger "had training

6

and the knowledge," but also acknowledged there would have been "no harm" in giving Geiger further warnings. Inglehart acknowledged that he keeps his own retired police service dog kenneled.

Clifton Bush, then the Department's Chief of Police, never warned Geiger about the dangers of keeping a retired police service dog or the conditions in which Neo should be kept, nor did he know whether anyone else warned Geiger. Bush did not believe Geiger required any further warnings.

Bush made the final decision to sell Neo to Geiger. He directed Inglehart to prepare the written sales contract. Inglehart copied the contract from a previous one. It stated that Geiger agreed "to continue the quality of care that Neo has been accustomed to and accept that neither the City of Exeter nor the Police K9 Association shall have no further financial liability for Neo." The contract did not, however, specify any warning against treating Neo as a pet, that Neo's patrol training could not be reversed, that Neo would remain dangerous, or that Neo needed to be kenneled when not under Geiger's direct control.

Geiger also agreed, "to hold harmless, defend and indemnify the City of Exeter and the Police K9 Association, from and against any and all cost, loss, expense or liability arising out of my ownership and control of Neo." Bush testified the contract could have required Geiger to kennel Neo, but did not. He believed the Department could not control how Geiger treated the dog after Geiger resigned from the Department.

Geiger moved to a rental house in Grover Beach that had a fenced back yard. Thereafter, he treated Neo as a pet. During the day, Geiger allowed Neo to play in the backyard with his German Shepard, Rolo. Geiger testified that he did not

7

understand Neo needed to be kept in his kennel and should not be treated as a pet.

## The Incident

On the day of the incident, Geiger went to work as a police officer, leaving both Neo and Rolo in the backyard. While on patrol, he received a text from a roommate, informing him that a board in the backyard fence was missing. Geiger went home, wedged the board back into place and returned to his patrol duties.

Later, Geiger received a radio call about a dog attack near his home. He arrived to find another officer pointing a shotgun at Neo who was covered in blood. Rolo was nearby, but had no blood on her. Two of Geiger's neighbors, David Fear and Betty Long, were lying on the ground, bleeding and obviously seriously injured. Geiger returned the dogs to his backyard. Thereafter, he surrendered Neo to an Animal Control officer to be euthanized.

## The Victims' Injuries

David Fear was standing in his front yard chatting with his neighbor, 85-year-old Betty Long, when Neo and Rolo came charging toward them. Fear was holding Long's little dog in his arms. Neo lunged at Fear and started mauling him. Neo bit both of Fear's arms, crushing both forearms and severing both radial arteries, causing him to bleed heavily. Neo also bit Fear on his right inner thigh and chest. Fear died three days after the attack, due to massive blood loss caused by these extensive and deep bite wounds.

Fear is survived by three adult children with whom he enjoyed a close relationship. Each of his children testified that Fear was an important support and friend to them.

Neo also knocked Ms. Long to the ground, causing her to hit her head and break her pelvis.  Neo bit Long on her right hip, lower abdomen and right upper thigh.  Her left arm and shoulder were displaced, requiring Long to undergo a complete shoulder replacement.

Long's health and well-being plummeted after the attack.  She had been living independently, driving, going out with her friends, traveling and volunteering as an election worker.  After the attack, Long was no longer able to live independently.  She used a walker and required assistance for all of her daily activities, including meals, grooming and personal hygiene.  Long's adult children took turns staying in her home to provide her with round-the-clock care.

Long developed post-traumatic stress disorder as a result of the attack.  This condition contributed to a stroke she suffered in 2018 which left her with a speech impediment.  Long continued to suffer from nightmares, anxiety and depression, despite taking medication.  In late 2020, about four years after the incident, Long fell while using her walker and fractured her hip.  She died in May 2023.

Testimony of Expert Witnesses

Two retired officers from the Los Angeles Police Department (LAPD) testified as expert witnesses for respondents.  Adam Bercovici spent part of his career as a canine handler and kept his service dog after he promoted to another assignment.  When he decided to keep his service dog, Bercovici received instructions from his supervisor and from the City Attorney about "the realities of having a retired canine."  Bercovici was warned that he needed to maintain the dog's obedience training, keep it kenneled when not in Bercovici's

control, and remain in the "alpha" or control position in his relationship with the dog. He opined that any canine handler who was taking ownership of a retired police service dog should be given the same warnings.

Bercovici acknowledged that POST, the organization that establishes and publishes policies for law enforcement agencies in California, does not publish standards governing the maintenance of retired police service dogs. Lexipol, a risk management company that writes policies and manuals for police departments, also does not publish policies relating to canine units or the maintenance of retired police service dogs.

Scott Allen DeFoe held numerous positions during his 20-year tenure in the LAPD, including supervising a canine platoon. He testified that neither the POST standards nor the Exeter Police Department's policies provide guidelines for retired service dogs. In DeFoe's opinion, Geiger did not have enough experience as a canine handler to understand or appreciate how to handle a retired canine. He opined that Geiger should have been given warnings concerning the care, maintenance and medical care his retired canine required. Geiger should also have been warned that Neo could not be socialized with other pets, could not be untrained and should be kept in a locked kennel when not under Geiger's direct control. In addition, Geiger should have been told that the dog would always be a dangerous weapon that could act on its own; Neo could not be turned into a pet.

Ron Cloward, a retired police officer who spent 28 years with the Modesto police department, helped to write the POST standards for active service canines. He acknowledged that POST has no standards relating to training for canine handlers or the care and maintenance of retired service dogs. Cloward

10

believed there was no industry standard requiring a working service dog to be confined in a kennel, crate or patrol car except when under the handler's direct control.

Cloward opined that any competent canine handler would also be competent to handle a retired service dog. The handler would understand how to keep the dog under the handler's direct control. If the handler is not present, the dog can only be controlled by being kept in a locked kennel. Many handlers, however, allow retired service dogs to run in a fenced yard without them being present. Cloward believed, "Each dog is going to act differently."

Cloward personally owns a retired service dog. He sometimes allows the dog to run in his fenced yard without him being present. He would also allow the dog to run in the fenced yard while a family member or friend was present. His current dog would be fine around a friend, but he has had other dogs that would react more aggressively. Cloward testified that, "Unfortunately, it is very common," to have a retired service dog unkenneled 100 percent of the time. He opined that retired service dogs should be kept in a kennel when their handler is not present.

Nhut Huynh, a long-time canine handler with the LAPD, testified that an officer who keeps a retired service dog accepts responsibility for the dog, which then becomes the officer's pet. He received no training or official warning before adopting his own retired service dog. Huynh uses "a degree of caution" with his retired service dog because, "we train certain things into them." He is cautious with the dog because the dog has been trained to bite and could react to certain behaviors. Although his retired service dog is allowed to be around family members, the

dog is not around friends or neighbors unless under Huynh's direct control.

Appellants contend the judgment must be reversed because they owed no duty to protect Long and Fear by warning Geiger about the dangers of keeping Neo.  Respondents amended their complaints to name Bush and Inglehart as defendants in place of Doe defendants.  Appellants contend the trial court abused its discretion when it denied their motion to amend their answer to allege the affirmative defense that the Doe amendments were untimely.  Finally, appellants contend the awards of noneconomic damages were excessive.  Because we conclude appellants owed no duty to warn Geiger, it is not necessary for us to reach the latter two issues.

*Discussion*

At trial, respondents asserted a single cause of action for negligence, alleging the City of Exeter was liable for their injuries because its employees, Bush and Inglehart, failed to warn Geiger that Neo would remain dangerous after being retired from active service, should be kenneled when not under Geiger's direct control, and could not be treated as a pet.  Appellants argued their conduct in selling Neo to Geiger as he left the Department was not negligent because, among other things, they had no duty to warn Geiger about Neo or to protect Long and Fear from Geiger's negligent care of Neo.

"[A] public employee is liable for injury caused by his act or omission to the same extent as a private person."  (Gov. Code, § 820, subd. (a).)  A public entity is liable for injury caused by the conduct of its employee within the scope of his or her employment "if the act or omission would, apart from this section, have given

12

rise to a cause of action against that employee . . . ." (*Id.*, § 815.2, subd. (a).)

"To establish a cause of action for negligence, the plaintiff must show that the 'defendant had a duty to use due care, that he breached that duty, and that the breach was the proximate or legal cause of the resulting injury.' [Citation.]" (*Brown v. USA Taekwondo* (2021) 11 Cal.5th 204, 213 (*Brown*).) Whether a specific defendant owes a duty of care to a specific plaintiff is a question of law. (*Ibid.*)

"Under general negligence principles, of course, a person ordinarily is obligated to exercise due care in his or her own actions so as not to create an unreasonable risk of injury to others, and this legal duty generally is owed to the class of persons who it is reasonably foreseeable may be injured as the result of the actor's conduct." (*Lugtu v. California Highway Patrol* (2001) 26 Cal.4th 703, 716.) The general duty of due care "includes a duty not to expose others to an unreasonable risk of injury at the hands of third parties . . . ." (*Id.* at p. 717.)

Civil Code section 1714 "'establishes the default rule that each person has a duty "to exercise, in his or her activities, reasonable care for the safety of others.""" (*Kuciemba, supra,* 14 Cal.5th at p. 1016, quoting *Brown, supra,* 11 Cal.5th at p. 214, quoting *Cabral v. Ralphs Grocery Co.* (2011) 51 Cal.4th 764, 768 (*Cabral*).) As the court reiterated in *Kuciemba*, this broad rule has its limits. (*Kuciemba, supra,* at p. 1016.) Civil Code section 1714 "'imposes a general duty of care on a defendant only when it is the defendant who has '"created a risk"' of harm to the plaintiff, including when '"the defendant is responsible for making the plaintiff's position worse.""" (*Kuciemba, supra,* at p. 1016.) A defendant ""who has not created a peril is not liable in

13

tort merely for failure to take affirmative action to assist or protect another" from that peril.'" (*Ibid.*, quoting *Brown, supra,* at p. 214.) *Kuciemba* distinguished between situations in which the defendant's own conduct created or contributed to the risk of harm and those in which the defendant failed to protect the plaintiff from harm caused by the negligent or intentional misconduct of a third party. The "default duty rule of Civil Code section 1714" applies to the first category of cases, but not the second. (*Kuciemba, supra*, at pp. 1017-1018.) "Where the defendant has neither performed an act that increases the risk of injury to the plaintiff nor sits in a relation to the parties that creates an affirmative duty to protect the plaintiff from harm, however, our cases have uniformly held the defendant owes no legal duty to the plaintiff." (*Brown, supra,* at p. 216.)

*Kuciemba* distinguished *Brown* and *Regents of University of California v. Superior Court* (2018) 4 Cal.5th 607 (*Regents*) on this basis. In both *Brown* and *Regents*, the plaintiffs alleged that institutional defendants failed to protect them from sexual assault by an athletic coach (*Brown*) or stabbing by a fellow student. (*Regents*.) "These defendants, a sport's governing body and a university, did not create or contribute to the risk of sexual abuse or stabbing. For that reason, the default duty rule of Civil Code section 1714 did not apply . . . ." (*Kuciemba, supra,* 14 Cal.5th at p. 1017.) The plaintiff in *Kuciemba,* by contrast, alleged that her husband's employer violated local health orders, exposing her husband to the SARS-Co-V-2 virus and causing her to catch COVID-19 from him. As the court explained, "The complaint does not allege that [the employer] was negligent in failing to protect [plaintiff] from harm caused by the negligent or intentional misconduct of a third party. Rather, it alleges

14

[plaintiff] was harmed by [the employer's] *own* misconduct in transferring potentially infected workers to [the husband's] jobsite and forcing [the husband] to work in close proximity to them." (*Ibid.*) Under these circumstances, "[t]he proper question . . . is instead whether the defendant's "'entire conduct created a risk of harm'" to the plaintiff," and not whether a special relationship existed between the parties. (*Id.* at pp. 1017-1018.)

In our view, appellants are more like the sports governing body in *Brown* or the university in *Regents*, than the employer in *Kuciemba.* Respondents' theory at trial was that appellants negligently failed to warn Geiger about the dangers of keeping Neo. But it was Geiger's negligent conduct that allowed Neo to escape his enclosure and attack appellants, causing their injuries. Unlike the employer in *Kuciemba*, appellants here did not violate any statute, ordinance or regulation when they sold Neo to Geiger, nor did they have any ability to control the conditions under which Geiger maintained the dog. For this reason, we conclude "the default duty rule of Civil Code section 1714 [does] not apply, and that the starting point for our analysis [is] instead the alternate rule that generally "'one owes no duty to control the conduct of another, nor to warn those endangered by such conduct.". . . '" (*Kuciemba, supra,* 14 Cal.5th at p. 1017.)

As our Supreme Court clarified in *Brown,* the question whether a defendant has a duty to protect a plaintiff from injuries caused by a third party "is governed by a two-step inquiry. First, the court must determine whether there exists a special relationship between the parties or some other set of circumstances giving rise to an affirmative duty to protect. Second, if so, the court must consult the factors described in *Rowland* [*v. Christian* (1968) 69 Cal.2d 108 (*Rowland*)] to

15

determine whether relevant policy considerations counsel limiting that duty."  (*Brown, supra,* 11 Cal.5th at p. 209.)

"A duty to control, warn, or protect may be based on the defendant's relationship with 'either the person whose conduct needs to be controlled or [with] . . . the foreseeable victim of that conduct.'"  (*Regents, supra,* 4 Cal.5th at p. 619, quoting *Tarasoff v. Regents of University of California* (1976) 17 Cal.3d 425, 435.)  The defendant's duty to control a third party may arise where the defendant has a special relationship with a foreseeably dangerous third party "that entails an ability to control that person's conduct."  (*Regents, supra,* at p. 619.)  A special relationship between the defendant and a victim is one that "gives the victim a right to expect protection" from the defendant.  (*Ibid.*)  Examples of these relationships include parents and children, colleges and students, employers and employees and common carriers and passengers.  (*Brown, supra,* 11 Cal.5th at p. 216.)

The conclusion that a defendant did not have a legal duty toward a plaintiff "constitutes a determination by the court that public policy concerns outweigh, for a particular category of cases, the broad principle" established in Civil Code section 1714.  (*Kesner v. Superior Court* (2016) 1 Cal.5th 1132, 1143 (*Kesner*).)  *Rowland, supra,* 69 Cal.2d at pp. 112-113, articulates the factors we should consider in determining whether public policy concerns support creating "an exception to the statutory presumption of duty set forth in Civil Code section 1714."  (*Modisette v. Apple Inc.* (2018) 30 Cal.App.5th 136, 144.)  Those factors are:  "the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the

moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost and prevalence of insurance for the risk involved." (*Rowland, supra,* at pp. 112-113; see also *Brown, supra,* 11 Cal.5th at p. 217.) Because Civil Code section 1714 establishes a general duty to exercise ordinary care, we rely on the *Rowland* factors "not to determine 'whether a *new duty* should be created, but whether an *exception* to Civil Code section 1714 . . . should be created.'" (*Kesner, supra,* at p. 1143.)

Respondents contend appellants had a special relationship with Geiger because he was employed by the Department when he and Inglehart signed the purchase agreement. The agreement states that Geiger will purchase Neo "and take him with me when I leave the department." Geiger's resignation, and his ownership of Neo, took effect one week after he signed the purchase agreement. At that point, appellants were no longer Geiger's employer and were no longer in a special relationship with him.

Respondents contend appellants' conduct created and contributed to the risk of harm posed by Geiger's negligent handling of Neo. They contend Inglehart and Bush convinced Geiger to purchase Neo by threatening to euthanize him after Geiger left the Department. Even though they knew Geiger's training had not included any information relating to retired service dogs, Bush and Inglehart failed to include any warnings or instructions on maintaining or caring for Neo in the purchase agreement. Their misrepresentations regarding Neo's being

17

euthanized and their failure to warn Geiger increased the risk that Neo would injure an innocent person.

But this argument is just a restatement of respondents' central contention that appellants had a duty to warn Geiger about the dangers of keeping Neo. The conduct respondents rely on as the basis for imposing a duty is appellants' failure to instruct or warn Geiger about the danger posed by Neo. As we have noted, however, a person generally has no duty to protect others from a peril the person did not create, unless that person has a special relationship with either the victim or the person who created the harm. (*Brown, supra,* 11 Cal.5th at pp. 213-214; see also *Jane Doe No. 1 v. Uber Technologies, Inc.* (2022) 79 Cal.App.5th 410, 424.) "A special relationship between the defendant . . . and the dangerous third party is one that 'entails an ability to control [the third party's] conduct.'" (*Brown, supra,* at p. 216.) Here, appellants had no special relationship with Geiger because he was not their employee and they had no ability to control his conduct after he resigned from the Department. Consequently, they had no duty to protect third parties from the peril, and potentially catastrophic damage, created by Geiger's negligent treatment of Neo.

Consideration of the *Rowland* factors supports this result. There can be no doubt that an unsupervised retired police service dog may pose a foreseeable risk of serious harm to anyone encountering it. Appellants were obviously aware of this risk because they were trained canine handlers and were familiar with the propensities of these dogs, and Neo in particular. But foreseeability "'alone is not sufficient to create an independent tort duty. "'. . . [The] existence [of a duty] depends upon the foreseeability of the risk and a weighing of policy considerations

18

for and against imposition of liability.”’”” (*Kesner, supra,* 1 Cal.5th at pp. 1149-1150, quoting *Erlich v. Menezes* (1999) 21 Cal.4th 543, 552.) These policy considerations include the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, ““‘the extent of the burden to the defendant and consequences to the community’”” of imposing a duty of care in this context, and the availability of insurance for the risk involved. (*Kesner,* at p. 1150; *Rowland, supra,* 69 Cal.2d at p. 113.)

While it is certain that respondents were grievously injured by Neo, the connection between those injuries and appellants' failure to provide more detailed warnings to Geiger is far from certain. “In determining whether one has a duty to prevent injury that is the result of third party conduct, the touchstone of the analysis is the foreseeability of that intervening conduct.” (*Kesner, supra,* 1 Cal.5th at p. 1148.) Here, the training appellants provided to Geiger included the instruction to keep Neo in his kennel unless he was under Geiger's direct supervision. Geiger was also instructed that Neo should not be socialized with other pets. Appellants had no reason to foresee or believe that Geiger would immediately abandon these warnings and instructions after he left the Department and retired Neo from active service. The connection between appellants' failure to warn Geiger and his negligent treatment of Neo is not close.

For similar reasons, we believe that recognizing a duty to provide more robust warnings here is unlikely to further the policy of preventing future harm. That policy is “ordinarily served, in tort law, by imposing the costs of negligent conduct upon those responsible.” (*Cabral, supra,* 51 Cal.4th at p. 781.)

19

The law generally assumes that "internalizing the cost of injuries caused by a particular behavior will induce changes in that behavior to make it safer." (*Kesner, supra,* 1 Cal.5th at p. 1150.) But the harmful behavior here is the handler's conduct in keeping a retired police service dog under conditions that are contrary to the instructions the handler received during training. Recognizing a duty on the part of supervisors and police departments to provide more robust warnings to handlers to continue following the instructions they have already received is unlikely to increase public safety because those parties have little or no control over the conditions under which retired police service dogs are kept.

Appellants contend that recognizing a duty in this context will impose a heavy burden on law enforcement and local governments that will ultimately be borne by taxpayers. We agree. If police departments are subject to liability for injuries caused by retired police service dogs they no longer own and that are kept under conditions they cannot control, the departments will be less likely to form canine units in the first place. Departments will also have an incentive to euthanize retiring service dogs rather than allow them to live with their former handlers.

The final *Rowland* factor, availability of insurance, is neutral in this case. Many local governments are self insured, but it is possible to obtain insurance against many potential losses associated government activities. In either case, the costs will be borne by taxpayers.

We conclude appellants had no legal duty to provide more robust warnings under these circumstances because Civil Code section 1714 does not apply and there was no special relationship

between appellants and Geiger sufficient to enable appellants to control Geiger's conduct. Even if appellants had a special relationship with Geiger, the *Rowland* factors do not support recognition of a duty to warn under these circumstances. In the absence of a legal duty, appellants cannot be held liable in negligence for causing or contributing to respondents' harm.

In reaching this conclusion, we wish to emphasize that we do not doubt the ghastly nature of Neo's rampage or the severity of respondents' injuries. But liability sounding in negligence is not premised on the depth of sympathy we feel for victims or the law's goal to compensate them at the expense of tortfeasors. As we have noted, the law does not permit us to impose on appellants a duty to control a former employee's conduct. There was no reason to foresee his disastrous lack of judgment and common sense. On these facts, we have no choice but to reverse the judgment.

*New Counsel and a New Theory*

Appellants obtained new counsel in March 2020, after this matter had been pending in the superior court for nearly three years. Three months later, appellants filed their second motion for summary judgment, contending respondents' claims were time-barred under the Government Claims Act because they did not "timely and truthfully" identify Bush and Inglehart as the allegedly negligent City employees. They further contended respondents' claims were barred by the statute of limitations because they did not timely substitute Bush and Inglehart for fictitiously named defendants. Respondents contended these affirmative defenses were waived because they were not pled in appellants' answer.

While the motion for summary judgment was pending, appellants filed a motion to amend their answer to allege the omitted affirmative defenses. They also subpoenaed documents from and the depositions of respondents' counsel, seeking to discover when respondents learned about the involvement of Bush and Inglehart. Respondents' counsel moved for protective orders and to quash the subpoenas.

The trial court granted the protective orders and imposed sanctions of $5,000 on appellants' counsel. It concluded appellants failed to show "extremely good cause" for deposing opposing counsel. (*Fireman's Fund Ins. Co. v. Superior Court* (1977) 72 Cal.App.3d 786, 790 (*Fireman's Fund*).) Appellants did not, in the trial court's view, demonstrate that counsel's testimony was crucial to the preparation of their affirmative defenses or that they had no other means of obtaining the information sought.

Appellants contend the trial court abused its discretion when it imposed sanctions. We are not persuaded.

Code of Civil Procedure section 2025.420, subdivision (h) mandates the imposition of sanctions against a party or counsel who unsuccessfully opposes a motion for protective order, unless the trial court finds "that the one subject to the sanction acted with substantial justification or that other circumstances make the imposition of the sanction unjust." We review the trial court's order imposing sanctions for abuse of discretion. (*New Albertsons, Inc. v. Superior Court* (2008) 168 Cal.App.4th 1403, 1422.) A "substantial justification" is one that is "'well grounded in both law and fact.'" (*Diepenbrock v. Brown* (2012) 208 Cal.App.4th 743, 747.)

As the trial court noted, depositions of opposing counsel "should be severely restricted, and permitted only upon a showing of extremely good cause . . . ." (*Fireman's Fund, supra*, 72 Cal.App.3d at p. 790.)  Such depositions should be permitted only when the party seeking discovery shows, "'that (1) no other means exist to obtain the information than to depose opposing counsel, [citation]; (2) the information sought is relevant and nonprivileged; and (3) the information is crucial to the preparation of the case.' [Citation.]" (*Spectra-Physics, Inc. v. Superior Court* (1988) 198 Cal.App.3d 1487, 1494-1945.)  Here, the trial court imposed sanctions because it concluded appellants had not carried their burden to show they had no other means to obtain the information sought or that the information was "crucial" to their case.  These findings were not an abuse of discretion.

The trial court was well within its broad discretion when it concluded that information relating to the timeliness of respondents' claims was not crucial to appellants' case. Appellants did not plead any affirmative defenses relating to the timeliness of respondents' claims and never explained their extreme delay in seeking leave to do so.  (*P&D Consultants, Inc. v. City of Carlsbad* (2010) 190 Cal.App.4th 1332, 1345 [leave to amend properly denied based on unwarranted delay]; *Hulsey v. Koehler* (1990) 218 Cal.App.3d 1150, 1159 [discretion to reject proposed amendment to answer "'when offered after long unexplained delay or on the eve of trial'"].)  Without leave to amend to plead these affirmative defenses, information relating to the timeliness of respondents' claims was not "crucial" to appellants.  These defenses were forfeited when appellants failed to properly assert them in a demurrer or plead them in an

answer.  (*Save the Agoura Cornell Knoll v. City of Agoura Hills* (2020) 46 Cal.App.5th 665, 681; Gov. Code, § 911.)

Similarly, appellants failed to show that subpoenaing documents from opposing counsel and taking their depositions were the only means appellants had of discovering when respondents learned the identities of Bush and Inglehart.  Public documents, were available to identify these city employees.  Other documents could have been obtained from third parties such as the District Attorney's office and Animal Services.

We conclude the trial court did not abuse its discretion when it imposed sanctions on appellants' counsel for opposing the motions without substantial justification. (Code Civ. Proc, § 2025.420, subd. (h).)

*Conclusion*

The December 11, 2020 order granting sanctions is affirmed.  In all other respects, the judgment is reversed.  Appellants shall recover their costs on appeal.

NOT TO BE PUBLISHED.


YEGAN, J.

We concur:


GILBERT, P. J.


CODY, J.

24

Barry T. LaBarbera, Judge

Superior Court County of San Luis Obispo

_____

Wilke Fleury and Suzanne M. Nicholson; Chester E. Walls, for Defendants and Appellants.

Lee H. Roistacher and Dean Gazzo Roistacher, for Amicus Curiae on behalf of Appellants.

Steven B. Stevens; Frederick Law Firm and Jacqueline Frederick; Cheong & Denove and John F. Denove, Alicia S. Curran; Reed Smith and Raymond A. Cardozo, for Plaintiffs and Respondents.